**Paige B. BAYOUD and George S. Bayoud**

v.

**Wiley P. BALLARD, Jr., et al.**

**Paige B. BAYOUD and George S. Bayoud**

v.

**Wiley P. BALLARD, Jr., and the Ballard and Cordell Corporation, a Georgia Corp.**

**Nos. CA 3-6425-C, CA 3-6547-C.**

United States District Court,
N. D. Texas,
Dallas Division.

Oct. 23, 1975.

Byron L. Williams and Erich Klein, Jr., Lyne, Klein, French & Womble, Dallas, Tex., for Paige Bayoud.

Joseph W. Geary and Rick J. W. Graham, Geary, Brice, Barron & Stahl, Dallas, Tex., for George Bayoud.

John O. Jones, Besing & Baker and Anthony Atwell, Atwell, Cain & Davenport, Dallas, Tex., for defendants.

## MEMORANDUM OPINION

WILLIAM M. TAYLOR, Jr., Chief Judge.

This suit is brought by the plaintiffs, Paige B. Bayoud and George S. Bayoud, ("Bayouds") against the defendants, Wiley P. Ballard, Jr., as President of Ballard and Cordell Corporation, the Ballard and Cordell Corporation (B & C), and the BABCO Petroleum Limited Partnership (BABCO), wherein plaintiffs seek rescission of their purchase of limited partnership interests in BABCO

and of their purchase of certain fractional undivided interests in certain oil and gas leases ("Ohio side-wells"), damages, and attorney fees. The monetary recovery sought in this securities fraud suit by Paige Bayoud totals $383,000.00 plus interest and attorneys fees, and the monetary recovery sought by his brother, George, totals $350,000.00 plus interest and attorneys fees.

This Court has jurisdiction over this dispute by reason of the plaintiffs' claims under the Securities Acts of 1933 and 1934 including Rule 10b–5 and Sections 4(2), 5, 12(1), 12(2), 17(a), and the respective Act's jurisdictional Sections, 22(a) and 27. Also, the plaintiffs have included a pendent claim, which seeks rescission of the aforementioned purchases under the Texas common law theory of fraud.

## I. FACTS

The plaintiffs are brothers who are both physicians in Garland, Texas. In the early part of 1971, the Bayouds sold their jointly owned Garland Medical Center for a sizable profit.[1] During the period of negotiation prior to this sale, the Bayouds grew interested in investing part of their expected profit in a "tax shelter", an entity whose operations would provide them with direct tax write-offs against their large capital gains expected for 1971.

During the summer months of 1971, the Bayouds' interest in "tax-sheltered investments" increased and became a common top of conversation at cocktail parties attended by the brothers. At one such party they were introduced to a man who served as a board of director member of Ballard and Cordell Corporation. The occasion for that initial discussion concerning the B & C oil and gas ventures arose after George Bayoud had become acquainted with numerous types of tax-sheltered investment ideas,[2] including a high risk venture of Grady Vaughan, III, which offered opportunities to participate in the exploration and drilling of wildcat oil wells.[3] Not feeling comfortable with the speculation inherent with Vaughan's scheme, the Bayouds turned to what they considered to be less risky investments.

The Bayouds' initial contact with President Ballard of B & C Corporation came in August 1971, when Wiley Ballard phoned from his Atlanta office to interest them in one of his publicly offered oil and gas ventures for that year. Over the next two and one-half months Wiley Ballard twice traveled to Dallas in order to discuss investment possibilities with the Bayouds.

By reputation, Wiley Ballard was a businessman knowledgeable in the financing, drilling, and mechanics of oil and gas explorations and development programs. In 1958, he incorporated his interests into the Ballard and Cordell Corporation, which, until 1961, was engaged primarily in the drilling and production of oil and gas as an operating agent for others.

The nature of its business became more sophisticated in 1961 when the corporation began acquiring and developing oil and gas properties for participants in joint drilling ventures. Despite the increasing complexity of Ballard's ventures, financing was acquired from only a few private sources. B & C raised its needed exploration and drilling capital from people connected with the oil industry, close friends, associates, and family members. However, this exclu-

---

1. Trial testimony indicated that the Bayouds realized approximately 1.6 million total on the sale of the 42-bed in-patient hospital clinic. Of the total, most turned out to be subject to capital gains tax treatment.

2. In addition to oil and gas ventures, George Bayoud also considered and investigated the possibilities of real estate syndications.

3. A wildcat oil and gas drilling operation envisions the drilling for oil and gas in unproven areas or formations, i. e., where no discovered oil pool of oil or gas had previously been made.

sively private policy changed somewhat in 1966 when B & C also began soliciting funds from the public in general. These registered public offerings resulted in increased capital for B & C exploration and drilling.

One further sophistication was added in 1971 when B & C offered the "Year-End Program". That program was designed to induce investments from investors who were looking for tax write-offs late in the year in which they expected a large tax bill. Both the 1971 regular "Oil and Gas Exploration and Drilling Program" and the "Year-End Program" were registered securities with the S.E.C.

In order to achieve the most significant "tax savings" for investors, these public offerings of B & C were made in the form of interests in limited partnerships. Each year B & C acted as the corporate general partner in both the regular and year-end partnership programs. Anyone investing money in one of those programs would do so as a limited partner, not as a general partner, in order that certain exploration and drilling costs incurred by the partnership would be allocated to them to use as deductions or off-sets against their personal income or capital gains for that year. The obvious advantage for a limited partnership with large drilling and exploration expenses (including dry holes) was that each limited partner would be able to take his proportionate share of deductions, reduce his income tax obligation for that and possibly succeeding years, and yet expect some return on his money in the future from the value of the oil and gas produced.

During his first visit to Dallas, Wiley Ballard tried to interest the Bayouds in his 1971 public limited partnerships. Considering the $700,000.00 size of their intended investment, the Bayouds were hesitant to participate in the public programs. They agreed with its basic plan, including the policy of having a mixture of exploratory and developmental wells drilled, but preferred a plan specially designed to satisfy their particular interests and wishes.

In an attempt to cater to the Bayouds' wishes for their own specially designed plan, Ballard's attorney presented the Bayouds with a tentative draft of the BABCO limited partnership, which contained their specifically requested modifications of the public program agreement. Mr. Johnson, the Bayouds' first attorney in this matter, countered by offering proposed amendments to Ballard's attorney in October, 1971. Later in October, 1971, Ballard and his counsel traveled to Dallas for the purpose of meeting with the Bayouds and their attorney in order to finalize and execute the limited partnership agreement. In the presence of their attorney, the Bayouds studied and signed the BABCO agreement, deciding to invest a total of $600,000.00 with $200,000.00 being paid immediately. In the BABCO agreement, the Bayouds specifically warranted that they had received current financial statements of B & C and that they were knowledgeable concerning investments in oil and gas exploration programs.

Shortly thereafter, the Bayouds amended the investment commitment schedule of their original agreement. In addition to increasing their investment to a total amount of $700,000.00, they agreed to pay the following amounts:

1. Total of $200,000.00 on November 9, 1971

2. Total of $100,000.00 on December 29, 1971

3. Total of $200,000.00 on December 30, 1971

4. Total of $200,000.00 on December 31, 1971

The total "basic investment" remained at $700,000.00 but by agreement of all the parties, the Bayouds each withdrew $17,662.50 from the BABCO program in order to purchase undivided working interests in the two Ohio side-wells. The parties also executed contracts whereby B & C agreed to drill wells on those lease sites. In addition to this $17,662.-

50 investment, Paige Bayoud independently decided to invest an extra $32,000.00 in the Ohio leases, making his total investment of $49,662.50 in them. Neither the BABCO investments nor these oil and gas undivided working interests were registered as securities with the S.E.C., because the defendants believed them to be "private deals", a type which does not require registration.

The plaintiffs have "lost" the vast majority of their original investments. In this suit the plaintiffs presented five alternate theories of recovery, which they claim entitle them to recoup their entire investment. All these theories focus on the nature of the defendants' intentions, purposes and/or statements— be they fraudulent or good faith—at the time of the plaintiffs' October 26, 1971, investment decision. To a large extent, remedies provided for by the 1933 and 1934 Securities Acts are of an "all or nothing" variety. Accordingly, the plaintiffs draw upon these acts in order to recover their full investments. After considering the evidence introduced at trial as to both the BABCO and Ohio side-well investments, the Court concludes that the plaintiffs failed to carry their burden of proof in this case.

## II. LEGAL ISSUES

■■ In support of their claims, the plaintiffs have advanced four alternative theories based upon the federal securities law, all of which require an initial finding that a "security" as defined therein was offered or sold through the use or means of interstate commerce. After reading Section 2 of the 1933 Securities Act and the supporting case law, the Court finds that both the BABCO

and Ohio side-well interests fit well within the liberally construed "securities" definition.[4]

## A. PRIVATE OFFERING EXEMPTION

The key device contained in the 1933 Securities Act for preventing fraud in the securities market place is the requirement of "full and adequate" disclosure. Almost anything a corporation does or attempts to do with "securities", if fully disclosed to potential and actual investors, will not result in liability to the offeror. To insure complete disclosure, the '33 Act requires that any attempt, with certain exceptions, by a person, company, or otherwise, to sell "securities", must be registered with the S.E.C. and an approved prospectus summarizing the information contained in the registration statement must accompany any initial sales offers to potential investors.

The plaintiffs complain herein that B & C violated Section 5 of the Act by (1) not having the BABCO limited partnership registered with the S.E.C., (2) not qualifying for an exemption from the registration requirement, and (3) not offering a prospectus together with current financial statements. They contend, consequently, that Section 12(1), which complements Section 5, allows them to rescind their investment and recoup their $700,000.00.

In opposition, the defendants contend, and the Court agrees, that B & C satisfied the 1933 Act's disclosure requirements by qualifying the BABCO partnership for a Section 4(2) "private offering" exemption from the normal reg-

---

4. Section 1, 15 U.S.C. 77b defines a security as any "certificate of interest or participation in any profit-sharing agreement, . . . transferrable share, investment contract, . . . fractional undivided interest in oil, gas, and other mineral rights . . . ". Under the interpretative case law set forth by the Supreme Court in *S.E. C. v. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1943), the BABCO in-

terests clearly fall within the investment contract definition of a security.
In similar fashion, the sale or assignment of a fractional undivided working interest in oil and gas rights, like the Bayouds' interest in the Ohio side-wells, was a security within the meaning outlined in *S.E.C. v. C. M. Joiner Leasing Co.*, 320 U.S. 344, 351, 64 S.Ct. 120, 88 L.Ed. 88.

istration requirements of Section 5. Section 4(2) provides that the "provisions of section 5 (requiring a registration statement) shall not apply to . . . (2) transactions by an issuer (B & C) not involving a public offering."

At the time of the Bayoud's $700,000.-00 investment in BABCO in October, 1971, no exact definition existed in either the 1933 Act, its rules, or its regulations by which a court or the parties could conclusively determine what transactions constituted private offerings. The applicable case law in October, 1971, *Hill York Corp. v. American National Franchises*, 448 F.2d 680 (5th Cir. 1971), provided for four factors to be used in determining whether or not a particular securities transaction deserves exemption treatment: (1) the number of offerees and their relation- the number of units offered, (3) the ship to each other and the issuer, (2) size of the offering, (4) and the manner of the offering.[5]

■ Overall, these factors are aimed at the ultimate question of whether the offerees, e. g., the Bayouds, are able, because of their sophistication and access to skilled advice, to fend for themselves. Or, more simply, do they need the protection afforded by a registration statement? *S. E. C. v. Ralston Purina Co.*, 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953), *S. E. C. v. Continental Tobacco Co.*, 463 F.2d 137 (5th Cir. 1972). The courts have used the above criteria to judge whether an offeree enjoyed a close enough relationship to the issuer so as to have actually possessed the same information which a registration statement would have provided or to have had access to such information so as to

enable him to make an informed investment decision. Generally, if the transaction involved a very limited number of contacted individuals and those offerees invested relatively large amounts, then the offering would take on a private aura about it.

The Court believes this to be the type of plan offered and sold the Bayouds in the fall of 1971. Although Wiley Ballard had originally introduced and offered the 1971 public program to the plaintiffs as an inducement, they rejected parts of it in preference to having their own specially drafted version. Their own attorney worked with them in revising the tentative draft to meet their particular wishes. That redrafting/negotiation process filled almost three months of activity before the two parties and their legal counsel signed the final agreement.

These facts obviously demonstrate that the B & C Corporation, through Wiley Ballard, extended the BABCO partnership offering to the Bayouds and no one else. That offering was as small and private as possible. The manner of negotiation and dealing between the parties and their respective counsel was certainly as private. The plaintiffs' investment, e. g., $700,000.00 was a large enough amount to give the BABCO transaction a private flavoring.

After considering all the evidence, it appears almost impossible to conclude that the plaintiffs didn't receive the factual equivalency of a prospectus or that they were denied or lacked access to such information from B & C itself. As pertains to business and financial matters the plaintiffs were not inexperienced, nor naive. They are, and were, successful doctors. They had made a financial success of their hospital and sold

---

5. To recover under a non-registration theory, using 4(2), 5 and 12(1), the plaintiffs must generally show the following: under Section 5
  1. that there was a sale or offer of sale of a security,
  2. that no registration statement was in effect at that time,

  3. that the sale was enhanced by the use of interstate transportation or communication or the mails,
  4. and the following 12(1) additional requirements: that privity existed between the buyer and seller,
  5. and that the plaintiff has offered to tender back the securities.

it at a considerable profit. Insofar as the venture involved in this case is concerned, they had chosen not to invest in the public offering of defendant but preferred a plan specially tailored to their own wishes and desires. They were astute enough to have employed their own attorney. All of these facts militate against a conclusion that they were unsophisticated and ill-informed.

■ The Court must conclude that all elements necessary to establish a private offering exemption have been proved.

## B. INTEGRATION THEORY

The plaintiffs contend that even if the BABCO securities were otherwise exempt from registration, that exemption was destroyed because it was "integrated" with the defendants' admitted 1971 public offering. The plaintiffs' "integrated offering" argument rests upon either a misunderstanding of its normal application in securities matters or a misunderstanding of the legal ramifications resulting from its application.

■ The "integration theory" has been utilized by courts to treat two separate securities issuances as one. This treatment is premised on the similar characteristics of the two securities and the close proximity in time of their respective issuances. *See* LOSS, SECURITIES REGULATION, Vol. 1 at 578 (1962). When two separate securities issuances are "integrated" into one, if either separate issuance was required to be registered, the integrated issuance must be registered.

■ In the instant case, the plaintiffs ask this Court to integrate the

BABCO offering into the 1971 public program on the grounds that they are both part of a "single plan of financing". In light of the private offering aspects of the BABCO transaction, the Court feels that the two issuances differed in significant and conclusive ways, such that integration would be improper.

Even if integration were proper, the 1971 public program's registration statement would still cover the integrated issuance. It would absorb the $700,000.00 BABCO investment since that addition to the already invested $3,270,000.00 would not exceed the maximum limit of $6,000,000.00 permitted by the public registration statement. In the final analysis, the integration theory fails to apply herein and, even if it did, nothing would be gained by the plaintiffs.

■ In so holding, the Court also rules that the defendants did not violate Section 12(1) since their offer and sale of the BABCO securities qualified for an exemption from the Section 5 registration requirements.

## C. SECTION 12(2), 17(a), AND RULE 10b–5 THEORIES

The plaintiffs' three remaining theories of recovery based on the 1933 and 1934 Acts all focus on the issue of whether the defendants by their oral statements, 1971 public prospectus, and BABCO agreement made material misrepresentations of fact or omitted material facts with the intent to induce the plaintiffs' $700,000.00 investment. Because they require similar evidentiary findings, all three counts—Section 12(2), Section 17(a), and Rule 10b–5—will be treated together.[6]

---

6. Generally, a Section 12(2) violation requires the following elements to be proven:
   1. That a sale or offer of sale of a security be made which is
   2. Enhanced by the use of any means or instruments of transportation or communication in interstate commerce or of the mails;
   3. That a prospectus or oral communication be used,

4. Which must
   A. include either an untrue statement of a material fact or
   B. omit to state a material fact necessary in order to make the statements, in light of the circumstances in which they were made, misleading,
5. With the purchaser not knowing of such untruth or omission,

In their attempt to prove fraud in the inducement to buy securities, the plaintiffs relied on two types of proof. First, they sought to introduce examples of the defendants' deliberate mismanagement and mishandling of their assets in the past. These alleged acts happened in late 1971 and early 1972. Second, they attempted to show how the BABCO operations failed to comply with Wiley Ballard's representations and guarantees made to them in the fall of 1971.

The plaintiffs' evidence proved deficient in several respects. Examples of the defendants' post-October 26, 1971, use of the $700,000.00 failed to prove any pre-conceived plan to defraud the plaintiffs. The defendants' inattention to accounting,[7] notice-giving,[8] and other details of the BABCO agreement introduced possibilities of a breach of contract but fell considerably short of proving any species of securities fraud. Many of B & C's omissions and sub-par performances can be attributed to the

6. And in the case of a sale or situation where privity exists between the plaintiff and defendant, the plaintiff must tender back or make a bona fide offer to tender back the securities.

To establish a Section 17(a) violation, assuming that individuals have private rights to actions therein, a plaintiff must show:

1. An offer or sale of securities by
2. The use of interstate transportation or communication or of the use of the mails
   A. to employ any device, scheme or artifice to defraud or
   B. to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading, or
   C. to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Rule 10b–5 has similar language, but its application is far broader. It generally requires the plaintiff to prove the following:

1. The use of interstate transportation or communication, or of the mails, or of any facility of any national security exchange
   A. To employ any device, scheme, or artifice to defraud,
   B. To make any untrue statement of a material fact or to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading or
   C. To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security,

2. The plaintiff must also satisfy varying degrees of proof as to the defendant's scienter, his own reliance.

7. The plaintiffs introduced evidence demonstrating that B & C's procedures for recording BABCO's proper acreage, percentage participation, and cost allocations in oil and gas leases showed many mistakes, most of which mattered little due to the wells' small production. For instance, a reversionary interest in the No. 1 Thatch was left unrecorded after the well was sold to a third party for final drilling. The likelihood of the reversionary interest ever maturing was and is very slight.

With respect to the No. 1 Leonard, the Secretary of the Company, Hess, could not explain why the BABCO program was misallocated its 31.25% participation interest in a 600-acre lease. The obvious mistake appeared to have been made without deceit or fraud on anyone's part.

The plaintiffs also introduced evidence of the fact that B & C mistakenly sold the No. 1 James interest to BABCO for $22,800.00 when it cost B & C only $17,500.00. Although this disparity in cost violated the BABCO agreement, the Court remains unconvinced that this error or any of the other ones amounted to anything other than sloppy bookkeeping. The Court cannot conclude that such disparities were deliberate attempts to defraud the Bayouds.

8. The Bayouds also complain that B & C, in numerous instances, contrary to the BABCO agreement, failed to notify them of their being allocated an interest in an oil and gas well or lease until after spudding or drilling had occurred. Of course, that failure represents a breach of the contract and not a securities matter. In addition, the plaintiffs never showed where or how they were damaged by this late notification. Because drilling activity occupied most of the B & C's administrative time during the end of 1971, the delays were reasonable.

general partner's efforts to do as much drilling as possible during the final three months of the tax year. Such last-minute efforts are the rule in oil and gas tax shelters as they produce large tax deductions for the limited partners. Carelessness and inadvertence account for the bulk of B & C's remaining failures and omissions and any such acts adversely affecting the Bayouds are de minimus.

■ The Court queried the plaintiffs' counsel on several separate occasions—during the trial and oral argument of this cause—as to whether the evidence adduced should be considered in the context of a breach of contract-money damages theory or a suit for accounting. It is apparent that plaintiffs have cast their complaints wholly upon fraud, and it is unnecessary for the Court to consider or rule upon breach of contract or accounting theories of recovery.[9]

■ In considering the plaintiffs' evidence, the Court finds it difficult to determine what constituted "asset mismanagement" for an oil and gas tax shelter that has an ostensible purpose of producing "tax losses" for its limited partners. The most obvious method for B & C to produce these "tax losses" was to drill dry holes, or, in other words, to fail to discover oil. From the 1971 public program prospectus, the Bayouds were certainly aware of the success B & C enjoyed in achieving that end. On page 16, the prospectus reported that on a gross basis, B & C had drilled eight dry holes out of 11 total wells for its 1966–67 public program, 14 out of 16 for its 1968–69 program, and 17 out of 25 for its 1969–70 program. To achieve the desired "tax advantages" for the

Bayouds, B & C obviously planned to drill exploratory wells which might end up being "dry". The trial evidence showed that insofar as the Bayouds were concerned, the BABCO program was too "successful" in this regard, Evidenec presented in this regard fails to prove any form of securities fraud.

The plaintiffs also adduced evidence, primarily in support of their Section 12(2) count, to show how the BABCO/B & C operation failed to comply with Wiley Ballard's representations made to them before their October 26, 1971, investment decision.

The Bayouds specifically complained that Wiley Ballard represented to them that the BABCO program was "a sure investment", guaranteed to return them a minimum $700,000.00 in oil profits. Of course, it is common knowledge that no investment, and particularly an oil and gas venture, is "dead, solid perfect". The Bayouds, like anyone who has lived in the oil-oriented environment of Texas, were familiar with the risks involved in the oil and gas drilling business.

The uncertainties in the business were noticed early by courts when they analogized the unknown and illusive subterranean movements of oil and gas to those of "wild animals". Until a drill and pipe found and delivered the mineral to the earth's surface, many courts rule that it remained open to anyone's capture.

■ Given the uncertainties of the oil and gas business, the Court cannot conclude that either a promoter would represent an investment as guaranteed or a knowledgeable investor would rely on such a representation.

---

9. The Court feels completely free from having to decide any contractual issues herein because of the attorney's pleadings and contrary wishes. Moreover, F.R.C.P. 15(b)

presents no obstacle since only consent to try "securities" related issues was ever given.

■ The plaintiffs also claim that Wiley Ballard promised to drill only "development wells" for the BABCO program. Section 1.02 of the BABCO Limited Partnership, an agreement which the Bayouds' attorney review, provided the contrary:

The General Partner and the Limited Partners hereby form a limited partnership for the purpose of investing and developing *exploratory*, proven, and *semi-proven* leases and other interests in oil and gas properties situated in such states as may be decided solely by the General Partner.

This provision of the BABCO program speaks for itself, and coupled with credible supporting testimony, convinces the Court that Wiley Ballard did not make such a promise.

Also without merit is the Bayouds' claim that an unexpectedly large public subscription to the 1971 B & C public programs together with tax considerations requiring substantial year-end drilling activity prevented B & C from having sufficient well prospects available for allocation to the BABCO program.

■ As in past years, B & C offered two public "limited partnerships" in 1971. The first, a typical public offering, became effective June 16, 1971, and the second, a "year-end program", became effective October 7, 1971, nineteen days before the plaintiffs' BABCO investment. Issued under a single prospectus, which the Bayouds received, the two offerings contemplated a maximum total investment of $6,000,000.00. A $2,685,000.00 public investment in the first 1971 offering left the second offering with a $3,315,000.00 ceiling, of which only $585,000.00 materialized. Given its past performance history, the Court finds that B & C anticipated and was fully capable of satisfying the well prospect needs required even for a maximum $6,000,000.00 public subscription. Moreover, the Court believes that the 1971 $3,270,000.00 public investment in no way impaired B & C's ability to serve the needs of the BABCO deal.

■ The Bayouds also claim that Wiley Ballard represented to them that the "5% Management Fee" covered all the BABCO administrative and overhead expenses when, in fact, Brillhart and others charged a special fee for their geological services performed at the well sites. This contention raises no element of fraud since Section 4.03 of the BABCO agreement specifically provides for these special charges:

. . . time actually spent by petroleum engineers and/or geologists on location, in connection with the activities of the Limited Partnership, shall be charged to the Limited Partnership at the standard rate in the industry for such services.

■ Wiley Ballard was further alleged to have misrepresented that none of the sources from which BABCO would acquire well prospects would be affiliated with the Ballard and Cordell Corporation. Considering the large number of oil and gas limited partnerships in which B & C acted as general partner in 1971, the Bayouds would certainly have included a "conflict of interest" provision in the BABCO agreement if they were actually worried about the problem. The Court cannot conclude that Ballard made such a misrepresentation.

■ Even if he did, the impact of any "conflict" was negligible because the B & C affiliated sources, of which the Bayouds claim fear of competition and ill dealings, ended up as partners, not competitors, in many of the BABCO

drilling efforts. In particular, the 1971 B & C public programs acted as an equal partner in seven out of the 21 BABCO well prospects. These common interests and the trial testimony lead the Court to conclude that the "conflict of interests", even if they existed, did not amount to securities fraud.

■ The plaintiffs' finally claimed that Wiley Ballard represented to them on October 26, 1971, that the B & C financial statements, dated May 31, 1971, accurately reflected the company's financial condition. In spite of the plaintiffs' ignorance of two ancillary transactions made by B & C,[10] the Court finds the defendants to have accurately represented B & C's financial condition insofar as it concerned the plaintiffs' only material interest therein—B & C's ability to complete their obligations to BABCO. *See, List v. Fashion Park, Inc.*, 340 F.2d 457 (2d Cir. 1965). The Court is not alone in concluding that those transactions were not materially important to an investor since the SEC required no amendment or sticker to the 1971 Year-End prospectus. Once again, fraud or securities violation findings cannot be made here.

### D. COMMON LAW FRAUD

For the same reasons as discussed above, the Court holds that the plaintiffs failed to carry their burden of proving that a common law fraud violation was committed by the defendants.

In accordance with the above, the defendants' attorney is directed to prepare

and submitted the appropriate order and form of judgment.

---

10. One of these transactions involved the "1971 Ballard & Cordell Oil & Gas Exploration" Limited Partnership's signing a $250,000.00 note. The note held little significance to the BABCO program because Ballard & Cordell, itself, did not act as the maker. The other transaction involved a promise by B & C to repurchase in the future $450,000.00 worth of securities sold to finance its own operations. Neither of these transactions affected B & C's ability to pay for exploration and drilling costs connected with the BABCO deal.