SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

The INTERNATIONAL MINING EXCHANGE, INC., Mansion Properties Corp., Mansion Properties Management Corp., Trenton H. Parker & Associates, Inc., and Trenton H. Parker, Defendants.

Civ. A. No. 80-K-1198.

United States District Court, D. Colorado.

May 21, 1981.

As Amended June 2, 1981.

John J. Kelly, Jr., Edward A. Lewkowski, S.E.C., Denver, Colo., for plaintiff.

William C. Waller, Jr., Denis H. Mark, Wagner & Waller, Englewood, Colo., for defendants.

## ORDER

KANE, District Judge.

This is an action to prevent further violations of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933, as amended [15 U.S.C. § 77e(a), 77e(c), and 77q(a)], Section 10(b) of the Securities Exchange Act of 1934, as amended [15 U.S.C. § 78j(b)] and Rule 10b–5 promulgated thereunder [17 C.F.R. § 240.10b–5] by defendants International Mining Exchange, Inc., Mansion Properties Corp., Mansion Properties Management Corp., Trenton H. Parker & Associates, Inc., and Trenton H. Parker, individually; and Sections 15(b) and 17(a) of the Securities Exchange Act [15 U.S.C. § 78*o* (b) and 78q(a), and Rules 15b3–1 and 17a–5 promulgated thereunder [17 C.F.R. § 240.-15b3–1 and § 240.17a–5] by defendants Trenton H. Parker & Associates, Inc., and Trenton H. Parker. Upon filing the complaint, plaintiff moved for a preliminary injunction to halt further violations of the Acts, pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]. After a five day hearing this motion was denied. The case is now before me on plaintiff's motion for summary judgment.

■ Summary judgment, pursuant to Fed.R.Civ.P. 56(c) is a drastic remedy, *Jones v. Nelson*, 484 F.2d 1165, 1168 (10th Cir. 1973), by which movants are given the opportunity to pierce the allegations in the pleadings. However, "[t]he power to pierce the flimsy transparent factual veil should be temperately and cautiously used lest abuse reap nullification." *Avrick v. Rockmont Envelope Co.*, 155 F.2d 568, 571 (10th Cir. 1946). Summary judgment is appropriate only where there exists no genuine issue of material fact. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970); *Luckett v. Bethlehem Steel Corp.*, 618 F.2d 1373, 1383 (10th Cir. 1980). As a matter of law, the movant must show entitlement to summary disposition beyond all reasonable doubt. *Norton v. Liddel*, 620 F.2d 1375, 1381 (10th Cir. 1980).

■ In order to determine the propriety of summary judgment I must construe all pleadings, affidavits, and depositions liberally in favor of the party against whom the motion is made. *Id.; Accord, Otteson v. United States*, 622 F.2d 516, 519 (10th Cir. 1980); *Commercial Iron & Metal Co. v. Bach & Co.*, 478 F.2d 39 (10th Cir. 1973). Summary judgment is not a substitute trial by affidavit. *Ando v. Great Western Sugar Co.*, 475 F.2d 531 (10th Cir. 1973). Under the rule, no margin exists for disposition of factual issues, and it does not serve as a substitute trial of the case nor require the parties to dispose of the litigation through affidavits. *Commercial Iron & Metal Co. v. Bach & Co.*, 478 F.2d at 41. Where different inferences can be drawn from conflicting affidavits, depositions and pleadings, summary judgment should not be granted. *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Romero v. Union Pac. R. R.*, 615 F.2d 1303, 1309 (10th Cir. 1980). For the reasons that follow I find that plaintiff has carried its burden as to Counts I, II, III, V, and VI of the complaint and on those counts summary judgment is granted. However, there are material issues of fact as to Count IV and therefore on this count summary judgment is denied.

The undisputed facts are as follows: Parker is involved in two investment programs. One involves selling gold mining concessions and the other buying and renovating various mansion properties in Denver. From September 1979 through December 10, 1979 Parker and The International Mining Exchange (Mining) offered and sold contracts for a "Gold Tax Shelter Investment Program" based on placer gold mining concessions located in the Paul Isnard area of French Guiana, South America. Beginning on or about December 20, 1979 and continuing to the present, Parker and Mining offered and sold an identical program based

on unpatented gold mining claims located near Juneau, Alaska.[1]

To invest in these programs, investors executed a check made payable to a payee designated by Mining, and signed various closing documents. As a result of these steps investors: (1) acquired a leasehold interest in a placer gold mine with proven reserves; (2) authorized Mining to arrange for the sale of options to purchase gold to be mined from the claim; and (3) authorized Mining to make payment from the proceeds of the sale of the options, along with the investor's check to a mining development company to develop the claim. Thus, the investor acquired an opportunity to profit from any gold mined and a federal tax deduction based upon the total cost of developing the mine, which is 500% or five times the investor's actual cash outlay.

Between September 1974 and December 1975 Parker organized and sold limited partnership interests in four partnerships, formed to renovate various mansions in the Denver area. Parker and his wholly owned corporation, defendant Mansion Properties Corporation (Mansion Properties), were the general partners. The general partners had complete control over all aspects of management and had the right to employ persons, firms, or corporations in which Parker was an employee, director, or shareholder. Parker hired and paid himself or his corporations as a real estate broker, broker-dealer, general contractor, leasing agent and building manager.

Investors in three of the mansions have received no return on their investments, while investors in the fourth have received a return of 80%. Parker has failed to distribute the proceeds of the sales to date, refused to make available books and records to the limited partners, failed to disclose the disposition of certain promissory notes and contested the limited partners' attempts to remove him and his corporate entities as general partners.

## "SECURITIES" WITHIN THE SECURITIES ACTS

Since the defendants have admitted that the limited partnership interests are securities, the threshold question is whether the gold mining contracts are securities under the Securities Exchange Act and the Securities Act. Since this circuit has held that the term "security" is not to be defined differently under the 1934 Act and the 1933 Act, in as much as the acts are to be considered *in pari materia*, both intended to cover similar interests, *Ballard & Cordell Corp. v. Zoller & Danneberg Exploration, Ltd.*, 544 F.2d 1059 (10th Cir. 1976), *cert. denied*, 431 U.S. 965, 97 S.Ct. 2921, 53 L.Ed.2d 1060 (1977), they will be discussed together.

Section 2(1) of the Securities Act [15 U.S.C. § 77b(1)] defines securities to include investment contracts. In *Securities & Exchange Com. v. W. J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), the Supreme Court held that "an investment contract," for purposes of the Securities Act, is a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party. The Supreme Court and the Tenth Circuit have reiterated and reaffirmed this test many times. *See, e. g., United Housing Foundation v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975); *Woodward v. Terracor*, 574 F.2d 1023 (10th Cir. 1978); *McGovern Plaza Joint Venture v. First of Denver Mort. Investors*, 562 F.2d 645 (10th Cir. 1977).

■ The primary purpose of the acts was to eliminate serious abuses in a largely unregulated securities market. The focus of the acts is on the capital market of the enterprise system, the sale of securities to raise capital for profit-making purposes,

1. Defendants changed locations because of a copyright infringement action brought against Mining by Compagnie Miniere De Paul Isnard, SA, Civil Action No. 79–F–1603. Parker consented to the entry of a preliminary injunction prohibiting the use of the name Paul Isnard and any representations that Mining or Parker had any interest in the Paul Isnard concession. The case was later settled and a permanent injunction was entered against Parker and Mining.

..., and the need for regulation to prevent fraud and to protect the interests of investors. *United Housing Foundation v. Forman*, 421 U.S. at 849, 95 S.Ct. at 2059. In applying acts of this general purpose ... the test is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out for the prospect. *Securities & Exchange Com. v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 352, 64 S.Ct. 120, 124, 88 L.Ed. 88 (1943). *Accord, Continental Marketing Corp. v. Securities & Exchange Com.*, 387 F.2d 466 (10th Cir. 1967). Therefore, in searching for the meaning and scope of the word "security" in the acts, form should be disregarded for substance and emphasis should be on economic reality. *Securities & Exchange Com. v. W. J. Howey, Co.*, 328 U.S. at 298, 66 S.Ct. at 1102. *See also, e. g., Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967); *Woodward v. Terracor*, 574 F.2d at 1024.

■ In deciding whether defendants' activities come within the *Howey* definition of "securities," with the above standards in mind, the following factors will be examined: (1) whether there is an investment of money; (2) whether the scheme in which the investment is made functions as a common enterprise; and (3) whether profits are derived solely from the efforts of others.

### INVESTMENT OF MONEY

■ Investment of money means that the investor must commit his assets to an enterprise or venture in such a manner as to subject himself to financial loss. *Stowell v. Ted S. Finkel Invest. Services, Inc.*, 489 F.Supp. 1209, 1220 (D.Fla.1980). It is clear that investors furnished checks to Parker and/or his corporations in both deals and neither side contends that there is any genuine issue of fact on this issue.

### COMMON ENTERPRISE

■ There is debate on whether a horizontal or vertical relationship between the investor and promoter satisfies the common enterprise language of *Howey*. A vertical relationship is essentially a one-on-one arrangement between the customer and broker. A horizontal relationship is between an individual investor and the pool of other investors. *Curran v. Merril Lynch, Pierce, Fenner & Smith*, 622 F.2d 216 (6th Cir. 1980). Some courts have adopted the horizontal approach. *See e. g., Curran, supra; Hirk v. Agri-Research Council, Inc.*, 561 F.2d 96 (7th Cir. 1977); *Milnark v. M–S Commodities, Inc.*, 457 F.2d 274 (7th Cir. 1972), *cert. denied*, 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144, while others have opted for the vertical approach. *See, e. g., Securities & Exchange Com. v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir. 1974); *Miller v. Central Chinchilla Group, Inc.*, 494 F.2d 414 (8th Cir. 1974); *Securities & Exchange Com. v. Glenn Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). The Tenth Circuit has not adopted either approach, so both will be explored.

For example, in *Milnark v. M–S Commodities, Inc.*, 457 F.2d 274, the court characterized the relationship as an agency for hire rather than the sale of a unit in a larger enterprise. Each contract creating the relationship was unitary in nature and would be a success or failure without regard to the others. *Id.*, at 277. Hence, the court held, the necessary element of commonality was absent. This was distinguished from schemes which attempt to create a pool of capital to be used in furthering a common enterprise by dividing the needed base into units for individual sales.

■ The vertical relationship approach defines a common enterprise as one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties. *Securities & Exchange Com. v. Glenn Turner Enterprises, Inc.*, 474 F.2d at 482. The critical factor is not the simplitude of coincidence of investors input, but rather the uniformity of impact of the promoter's efforts, or in other words, whether the fortune of all investors are inextricably tied to the success of the trading enterprise. *Securities & Exchange*

*Com. v. Koscot Interplanetary, Inc.*, 497 F.2d at 478. The *Koscot* court concluded that the fact that an investor's return is independent of that of other investors in the scheme is not decisive. *Id.*, at 479.

Here, defendants' activities come within both the vertical and horizontal definitions of common enterprise. In the mining schemes, the investor's fortunes are directly tied to the efforts of Parker and Mining in engaging development contractors and selling the gold options. Without this effort the investor would lose the opportunity to profit from the gold mined as well as the 500% tax write-off. In addition, if the development work is not done the investor breaches the terms of the lease. Thus, there is a one-on-one relationship between the investor and the promoter. Each inv^s-tor is also in a common enterprise with the other investors. No single interest is really large enough to warrant the purchase, rental, transport, and maintenance of the heavy equipment needed to develop the claims. Roads and camp sites would have to be erected to develop the claims. Although it may be possible to develop each claim individually, it is not economically feasible and in fact none of the investors did so. In addition, if an investor chose to assume his own expenses and mine his own claim, rather than rely on Parker and Mining, he would lose the 500% tax write-off, which is the linchpin of the investment. Here there is a pooling of resources to develop the claims which brings the program within the horizontal common enterprise definition.

Defendants claim they are not engaged in a common enterprise regardless of which approach is adopted because essentially they act only as real estate brokers, and collect commissions, not profits. In *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036 (10th Cir. 1980), the court examined whether the purchase of lots, combined with defendant's promises to develop constituted investment contracts within the statutory definition of security. The court did not decide the issue, but it did delineate factors to be examined in so deciding. The court employed the "character the investment is given in commerce" test used in *Securities*

& *Exchange Com. v. Joiner Leasing Corp.*, 320 U.S. at 352, 64 S.Ct. at 124 and held that central to this test is the promotional emphasis of the developer. Characterization of the inducement cannot be accomplished without a thorough examination of the representations made by the defendants as the basis of the sale. Promotional materials, merchandising approaches, oral assurances and contractual agreements are to be considered in testing the nature of the product. *See also, Woodward v. Terracor*, 574 F.2d 1023; *McCown v. Heidler*, 527 F.2d 204 (10th Cir.). Thus the sale of real estate for a commission does not necessarily preclude finding an investment contract. Given the representations made by defendants in selling the mining investments there is no doubt that they are acting as more than real estate brokers and are in fact selling investment contracts within the meaning of the securities laws.

## PROFITS SOLELY FROM THE EFFORTS OF OTHERS

### *Profits*

With respect to the mining investments, it is unclear whether profits were to take the form of tax benefits, the sale of gold, or both. Plaintiff maintains that investors expect profits from both aspects of the deal with neither aspect predominating. Defendants maintain that the primary motivation behind investing in the program was the substantial tax benefits, and under *United Housing Foundation v. Forman*, 421 U.S. at 855, 95 S.Ct. at 2061–62, taxes cannot be considered profits for purposes of the securities laws. The law in this area is sparse and unclear and therefore will be examined in some detail.

In *Forman, supra*, the Supreme Court held:

> We know of no basis in law for the view that the payment of interest, with its consequent deductibility for tax purposes, constitutes income or profits. These tax benefits are nothing more than that which is available to any homeowner who pays interest on his mortgage.

In a footnote the court added:

Even if these tax deductions were considered profits, they would not be the type associated with a security investment since they do not result from the managerial efforts of others.

*Forman* involved shares in a non-profit cooperative housing development. The tax deductions were a special federal tax provision intended to place tenant shareholders in the same position as homeowners so far as deductions for interest and taxes were concerned. The court noted that no profits could be obtained upon sale of the shares and that defendants were attracted by a decent place to live rather than making a profit.

Other cases dealing with this issue have come to different and sometimes seemingly contradictory conclusions. In *Sunshine Kitchens v. Althanthus Corp.*, 403 F.Supp. 719 (D.Fla.1975) the transaction in question contemplated favorable federal income tax benefits and expectations of a return on the investment. The court held that the dissent in *Forman* felt that the tax benefits could only be realized through the efforts of others, and this view was rejected by the majority. In addition, since the success of the arrangement was not dependent upon Althanthus' efforts, Sunshine did not even come within the broader view advanced by the dissent in *Forman*. *See also, Braniff Airways, Inc. v. LTV Corp.*, 479 F.Supp. 1279 (D.Tex.1979).

However, in *Stowell v. Ted S. Finkel Invest. Service, Inc.*, 489 F.Supp. 1209 (S.D. Fla.1980), the court held that as long as there is an expectation of profits, the tax consequences can properly be the inducement for, as well as an incidental benefit of, an investment, and to the extent *Sunshine Kitchens, supra*, a previous case by the same court states otherwise, it is incorrect. That the tax benefits to be derived from this investment were an important consideration was not surprising or compelling, and in fact, the court held, it would be an unwise investor who invested in a venture without careful consideration of the tax ramifications of that investment. Moreover, tax benefits could be the sole reason

why an investor would decide to make an investment or choose one investment over another. This case is consistent with other cases where the overall scheme involved the essential elements of an investment contract and the profits were to take the form of a direct return on the investment and a favorable tax shelter. *See, Goodman v. Epstein*, 582 F.2d 388, 408 (7th Cir. 1978), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979); *Sharp v. Coopers Lybrand*, 457 F.Supp. 879 (D.Pa.1978); *Shamburger v. McCann*, CCH Fed.Sec. ¶ 96,862 (1979); *Bayoud v. Ballard*, 404 F.Supp. 417 (D.Tex.1975). *See also, Eichen v. E. F. Hutton & Co., Inc.*, 402 F.Supp. 823 (D.Cal. 1975).

Such is the situation in the instant case, where defendants projected profits from gold mined and significant tax write-offs from the sale of the options to raise the money to mine the gold. The tax benefits could be obtained only if Mining sold the gold options and made payment to a mining development contractor. The tax benefits result solely from the managerial efforts of others, as does the actual development of the mines. Thus, any benefit is dependent upon Mining's efforts to sell the options and pay the developer.

*Solely From The Efforts Of Others*

It is well settled that "solely" is not to be given a literal interpretation. *See e. g., Crowley v. Montgomery Ward & Co.*, 570 F.2d 877 (10th Cir. 1978); *Hector v. Weins*, 533 F.2d 429, 433 (9th Cir. 1976); *Securities & Exchange Com. v. Koscot International Inc.*, 497 F.2d 473. In *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, the Tenth Circuit quoted with approval the Ninth Circuit opinion of *Securities & Exchange Com. v. Glenn Turner Enterprises, Inc.*, 474 F.2d 496 as a realistic interpretation of the phrase. The test in that case was whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise. *See also, Crowley v. Montgomery Ward & Co., Inc.*, 570 F.2d 877. There-

fore, reliance of the investor on the promoter need not be total. *McCown v. Heidler*, 527 F.2d 204. In the instant case the reliance on the promoters was almost total, since the investor merely executed closing documents and a check. All of the other aspects of the transaction were handled by Parker and Mining. Thus any profits resulted from the efforts of others.

■ It is clear that the gold investment scheme involved an investment of money in a common enterprise, with profits derived solely from the efforts of others. Thus the test delineated in *Howey, supra,* has been met and the scheme is subject to the provisions of the acts.

## VIOLATIONS OF THE ACTS

### *The Gold For Tax Dollars Investment Program*

■ Counts I and II of the complaint allege, respectively, violations of the registration and anti-fraud provisions of the Securities Act and the Securities and Exchange Act by Parker and Mining in the marketing and selling of the gold investment scheme. Having established that defendants were marketing securities, summary judgment is granted on Count I, since there are no genuine issues of fact as to whether defendants registered the securities as required by the Acts.

Whether there have been violations of the anti-fraud provisions is not quite so clear cut, however there is overwhelming evidence of misrepresentation and material omissions of fact on the part of the defendants in the marketing and selling of this program. Since the sale of investment contracts in the Paul Isnard mining concessions in French Guinea, S. A. have been halted pursuant to a permanent injunction entered against Parker and Mining by Judge Sherman Finesilver, United States District Court for the District of Colorado, Civil Action No. 79–F–1603, they will not be considered here. However, there is evidence of continuing ongoing activity in violation of the acts in relation to the property located in Juneau, Alaska.

Parker and Mining represented that investors would realize a federal income tax deduction equal to 500% of their investment and the potential for substantial profits from gold in the mines. However, such a tax deduction would be impermissible and fraudulent because Mining did not incur the development expenses required by the rules and regulations of the Internal Revenue Service. Parker did not arrange for sale of the options to purchase the gold to be mined and finance the development cost, as promised to investors upon execution of the closing documents. Instead, investors were furnished with copies of fraudulent Wellington cashiers checks. There is even considerable doubt as to whether Wellington exists at all, or, at least in a capacity to perform the services defendants represented it performed. The evidence also shows that Seagull Creek Silver Ltd. did not receive checks issued by Wellington as payment for mining development work to be performed at the Lady Dee Mine, as Parker and Mining represented to investors.

■ In addition, Mining and Parker have omitted to inform investors that on March 17, 1980, the Internal Revenue Service issued Revenue Ruling 80–72 which limits an investor to a tax deduction equal to his actual investment thereby precluding the 500% tax deduction. Yet Parker and Mining continue to market these securities and at the same time contend that the tax shelter aspect of the program is the predominant motivation for buying them. Thus, it is clear that defendants have perpetrated fraud upon the investing public in the marketing and selling of these investments. They have no manifest intention of developing the mines and know investors cannot obtain the 500% tax deduction. Summary judgment is therefore granted on Count II of the complaint.

### *The Mansion Properties Limited Partnership Interests*

Count III of the complaint alleges violations of the registration requirements of the acts in the selling of limited partnership interests in Denver mansion properties.

Defendants concede that the mansion partnership interests were securities, but claim they were exempt from registration pursuant to the private offering exemption in Section 4(2) of the Securities Act [15 U.S.C. § 77d(2)] and Regulation 146 [17 C.F.R. § 230.146] promulgated thereunder.

The first issue is who has the burden of proving an exemption under this provision. Generally, once the SEC introduces evidence that a defendant has violated the registration provisions of the Acts, the defendant then has the burden of showing entitlement to an exemption. *Securities & Exchange Com. v. Ralston Purina Co.*, 346 U.S. 119, 126, 73 S.Ct. 981, 985, 97 L.Ed. 1494 (1953); *Securities & Exchange Com. v. Murphy*, 626 F.2d 633, 641 (9th Cir. 1980). However, on a motion for summary judgment, it is the moving party who carries the burden of proof; he must show that no genuine issue of material fact exists, even though at trial his opponent would have the burden of proving the facts alleged. *Securities & Exchange Com. v. Murphy*, 626 F.2d at 641. Thus the SEC is incorrect in contending that the defendants have failed to meet their burden of showing an exemption under § 4(2). This burden is on the SEC. However, for the reasons stated below, I find that plaintiff has met its burden and summary judgment shall enter on Count III.

The applicability of § 4(2) turns on whether the particular class of persons affected needs the protection of the act. An offering to those who are shown to be able to fend for themselves is not a public offering. *Securities & Exchange Com. v. Ralston Purina Co.*, 346 U.S. at 125, 73 S.Ct. at 984. *See also, e. g., Andrews v. Blue*, 489 F.2d 367 (10th Cir. 1973); *Garfield v. Strain*, 320 F.2d 116, 119 (10th Cir. 1963); *Woodward v. Wright*, 266 F.2d 108, 115 (10th Cir. 1959). Other relevant factors include the number of offerees and their relationship to one another and the issuer, the number of units offered, and the size and manner of the offering. *Doran v. Petroleum Management Corp.*, 545 F.2d 893, 900 (5th Cir. 1977). *See also, Garfield v. Strain*, 320 F.2d at 119.

An offering to a diverse and unrelated group would have the appearance of being public, *Securities & Exchange Com. v. Murphy*, 626 F.2d at 647, although a small number of shares issued does not cause the offering to be private. *Andrews v. Blue*, 489 F.2d at 367. Moreover each offeree in a private transaction must be afforded the same information that would have been afforded a prospective investor in a public offering, or the offeree must be shown to otherwise have had such information or ready access to it. *Securities & Exchange Com. v. Murphy*, 626 F.2d at 647. *See also, Doran v. Petroleum Management Corp.*, 545 F.2d at 903. Finally evidence of a high degree of business or legal sophistication on the part of all offerees does not suffice to bring the offering within the private offering exemption. *Doran*, at 902. If the offerees do not possess the information required in a registration statement they cannot bring their sophisticated knowledge of business affairs to bear on deciding whether to invest. Thus sophistication is not a substitute for access to information that a registration statement would disclose. *Id., quoting Hill York Corp. v. American International Franchises, Inc.*, 448 F.2d 680, 690 (5th Cir. 1971).

The evidence shows that defendants did not supply sufficient information to investors on the first three mansions which were also the unregistered partnership interests. This is in marked contrast to the fourth mansion partnership which was registered and whose offering memo informed investors that the risk was high and that Parker's corporate entities would be hired to perform the work. No such information was furnished to investors in the first three mansions. Defendants, in their brief in opposition to summary judgment, cite testimony tending to show that some (but certainly not all) of the investors were rather sophisticated in their knowledge of investments and the inherent risks involved in such ventures. However, this is not a substitute for access to information that a registration statement would disclose. *See Doran, supra.*

Count IV of the complaint alleges violations of the anti-fraud provisions of the act in the offering for sale and selling of the limited partnership interests. Plaintiff alleges that defendants represented to offerees and purchasers of the limited partnership interests that they could expect a 25%–50% annual cash return on their investment; could reasonably expect 100%–200% capital appreciation in six to nine months; and could reasonably expect to recover their investments by the end of the following year. These representations did not reach fruition and plaintiff maintains that it is because Parker diverted funds to his own use by: (1) causing his wholly owned corporation to receive a 10% commission on all investor funds; (2) having his corporations installed as general partners; (3) including in the articles of incorporation a provision that permitted him and the corporate general partners to retain and pay himself and corporations which he controlled, to renovate and manage the mansions; and (4) exercising a provision which allowed him to make payments to himself and his corporations from partnership funds, which he described as leasing commissions, management fees, building management fees, etc.

However, defendants have introduced evidence that the limited partners knew Parker owned the corporation which was to be the general partner, knew the general partners had broad management powers and there was no objection to it, knew there were no guarantees and there were some risks involved in the venture, and had no objection to the construction work being done by a construction company controlled by Parker.[2] Defendants have also introduced evidence that Parker began the projects with good intentions.[3] There is also evidence that the records of the limited partnership were accurate and reflected the amounts invested by investors, that no checks were written to Parker individually, and no conclusions can be drawn concerning the financial transactions, books, or records of any of the limited partnerships.[4] David Smith, the accountant for the limited partnerships testified that he did not notice anything out of the ordinary or not in accordance with generally accepted accounting principles in the books supplied to him, that entries were made by him and another accountant, that the use of promissory notes involved in the purchase of the mansions was not unusual, and, most importantly, the financing problems encountered could not have been foreseen.[5] The architect on the project testified that the renovations were done relatively quickly and expeditiously; the quality of the work was good; problems were handled reasonably, expeditiously, and efficiently; that it was typical for a general contractor to have the labor intensive work done by his own crew; and it was reasonable to assume that the mansions would be leased.[6]

With all inferences resolved in favor of the defendants I am convinced that there are genuine issues of material fact of whether defendants acted fraudulently with regard to the partnership interest. Additional evidence will have to be introduced to determine if defendants' acts were fraudulent. In addition, defendants are no longer selling the limited partnership interests to that a sense of urgency or continuing harm is not presented. Therefore, summary judgment is denied on Count IV of the complaint.

Counts V and VI of the complaint allege technical violations of the acts. Count V alleges that defendants failed to file an amendment to their broker-dealer application pursuant to 15 U.S.C. § 78o and Rule 15b3–1 (17 C.F.R. § 240.15b3–1) pro-

2. Testimony of Robert Herzfeld, Oct. 14, 1980, pp. 67–69, 70, 86, 93.

3. Testimony of Ted Travis, Oct. 14, 1980, p. 210.

4. Testimony of John Wasserberg, Oct. 14, 1980, pp. 99, 116, 119, 133.

5. Reporter's transcript, Oct. 27, 1980, at 75–76, 77, 83, 84.

6. Reporter's transcript, Oct. 27, 1980, at 33, 34, 41, 42, 52, 63.

mulgated thereunder, to reflect revocation, by the State of Colorado, of authority to do business here by Trenton Parker and Associates, Inc. Count VI alleges that defendants failed to file an audited financial statement pursuant to Rule 17a–5(d) (17 C.F.R. § 240.17a–5(d)). Since defendants concede that there are no genuine issues of material fact concerning these counts, and it is clear that their applications are still on file with the SEC and thus they are subject to the provisions of the acts, summary judgment is granted on both counts. Accordingly, it is

ORDERED that defendants International Mining Exchange, Inc., and Trenton H. Parker and their respective officers, directors, agents, servants, employees, attorneys, and those in active concert or participation with them are enjoined permanently from making use of any means or instruments of transportation or communication in interstate commerce, or of the mails to offer to sell or sell any investment contracts based upon gold tax shelter investment programs offered by the International Mining Exchange, Inc., or any other similar security until a registration statement is in effect with the Securities and Exchange Commission as to such securities. Provided, however, that nothing in the foregoing portion of the injunction shall apply to any security or transaction which is exempt from the provisions of Section 5 of the Securities Act of 1933, as amended. It is further

ORDERED that defendants The International Mining Exchange, Inc., and Trenton H. Parker, individually, are enjoined permanently from directly or indirectly, in connection with the sale, offer for sale, purchase, or offer to purchase, of securities, from making use of any means or instruments of transportation or communication in interstate commerce, or of any instrumentalities of interstate commerce, or of the mails to employ any device, scheme or artifice to defraud, or to engage in any transaction, practice or course of conduct which operates or would operate as a fraud or deceit upon purchasers, or to obtain money or property by means of untrue statements of material facts, or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. It is further

ORDERED that defendants The International Mining Exchange, Inc., Trenton H. Parker, individually, and their respective officers, directors, agents, servants, employees, attorneys, and those in active concert or participation with them, are permanently enjoined from directly or indirectly, in connection with the sale, offer for sale, purchase, or offer to purchase, of securities, namely investment contracts based upon gold tax shelter investment programs offered by the International Mining Exchange, Inc., or any other similar security, making use of any means or instruments of transportation or communication in interstate commerce, or of the means or instrumentalities of interstate commerce, or of the mails, to employ any device, scheme or artifice to defraud, or to engage in any transaction, practice or course of conduct which operates or would operate as a fraud or deceit upon purchasers, or to obtain money or property by means of untrue statements of material facts, or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. It is further

ORDERED that defendants Trenton H. Parker and Associates, Inc., and Trenton H. Parker file, or cause to be filed, within 45 days of the date of this Order, with plaintiff Commission amendments to Form BD correcting inaccurate information therein, if defendant is then registered with the Commission. It is further

ORDERED that defendants Trenton H. Parker and Associates, Inc., and Trenton H. Parker file or cause to be filed, within 90 days of the date of this Order, with plaintiff Commission audited financial statements if defendant, is at that time, registered with plaintiff Commission.