**Dr. A.J. KOLIBASH, Jr., et al., Plaintiffs,**

v.

**SAGITTARIUS RECORDING COMPANY, et al., Defendants.**

**No. C2–85–1017.**

United States District Court, S.D. Ohio, E.D.

Jan. 27, 1986.

---

Michael J. Johrendt, Mayer, Johrendt & Cook, Co., Columbus, Ohio, for plaintiffs.

Chester E. Kasiborski, Jr., John J. Ronayne, Kim R. Kolb, Van Til, Kasiborski & Ronayne, Detroit, Mich., for defendants Rose, Feldman and Stephen Feldman.

## OPINION AND ORDER

KINNEARY, District Judge.

This matter comes before the Court to consider the defendants' motion to dismiss. This case arises from a tax shelter scheme

involving the lease of "master recordings" by defendant Sagittarius Recording Company to various individuals. Twenty-three of these individuals have joined this suit as plaintiffs and assert sixteen different counts against the architects and promoters of the scheme as well as various accountants, attorneys and other individuals who rendered professional opinions regarding the value of the recordings as well as legal and tax aspects of the scheme. The plaintiffs allege violations of state and federal securities laws, the Racketeer Influenced and Corrupt Organizations Act as well as common law fraud, negligence, breach of warranty and breach of contract as grounds for seeking relief from the defendants. Defendants Rose, Feldman, Rodin, Pavone & Skehan ("Rose, Feldman"), a New York accounting firm, and Stephen Feldman, a licensed certified public accountant with Rose, Feldman, move to dismiss plaintiffs' claims alleging violations of the federal securities laws.

## Statement of Facts

The tax shelter scheme involved in this case, known as the Sagittarius Recording Company Master Recording Lease Program (the "Program"), was marketed by defendant Sagittarius between 1980 and 1983. Under the Program, Sagittarius purchased the rights to various "master recordings."[1] It paid for the master recordings with small cash down payments and unconditional full recourse notes. These notes are full recourse only with respect to Sagittarius, are secured by a security interest in the master recordings and are due on December 31, 1991. However, the notes are prepayable, prior to maturity, from the net proceeds derived from the marketing of each master recording.

Sagittarius leased the master recordings to the plaintiffs for a period of 7½ years. Pursuant to the terms of the lease agreement, the lessee/investor would make an initial cash payment of between $11,300 and $22,600 in 1981 and an additional payment of between $8,700 and $17,400 in 1982, depending upon the value of the master leased by the lessee/investor. See 1981 Program, Exhibit A to Complaint.[2] In addition, each lessee was obligated to make efforts to promote and commercially exploit his master recording and spend at least $3,500 within six months from the date of the lease for such promotion and distribution. Sagittarius provided each lessee with the names of potential distributors but otherwise did not assist or offer to assist the lessee in his efforts to promote and distribute the master recording. Finally, each lessee was required to pay to Sagittarius a certain percentage of the net proceeds derived from exploitation of the master recording.

In consideration for the lease payments, Sagittarius transferred the investment tax credit associated with the purchase of each master recording to the lessee. Depending upon the value of the master recording, the lessee/investor would receive a first year investment tax credit of between $39,500 and $80,000. Sagittarius represented that the investment tax credit in conjunction with the write-off of the first year lease payment would result in a ratio of tax write-off to lease payment of approximately 8 to 1. *Id.* Exhibit A, 1981 Program. In addition to the tax benefits, the lessees would also receive a certain percentage of the net proceeds which they earned as a result of promoting and distributing the master recordings. However, it is undisputed that many or all of the investors lacked the experience typically required to successfully market the recordings.

In order to attract investors, plaintiffs allege that defendants Sagittarius and Frank J. VanArsdale ("VanArsdale"), in conjunction with the accounting firm of Rose, Feldman, assembled a promotional package describing the Program and its purported benefits. This package consist-

---

1. A "master recording" is a collection of musical recordings from which phonograph records, tapes and cassettes are manufactured.

2. These figures only apply to the 1981 Program. The amount of the initial payment and second payment differed each year of the program.

ed of: (1) a description of the Program; (2) a description of the master recordings being offered through the Program; (3) a statement as to the background and qualifications of the defendants; (4) illustrations of the tax and cash benefits purportedly available from investing in the Program; (5) financial statements of Sagittarius; (6) tax and legal opinions concerning the legitimacy of tax benefits represented by Sagittarius; and (7) professional opinions by appraisers concerning the market value of the master recordings. The plaintiffs allege that they invested in the Program based upon the representations in the promotional material and suffered economic loss because of fraudulent and negligent omissions and misrepresentations of material facts in the above materials.

### Defendants' Motion to Dismiss Federal Securities Law Counts—No Security

Defendants Rose, Feldman and Stephen R. Feldman move to dismiss the plaintiffs' first five federal securities laws claims on the grounds that the Program offered by Sagittarius did not constitute a security within the meaning of section 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), or of section 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10). The plaintiffs maintain that the Program constituted an "investment contract" and therefore was a security within the meaning of the above sections. However, the defendants maintain that the Program lacked the essential elements which characterize an investment contract. These elements include the presence of (1) an investment of money, (2) in a common enterprise, with (3) profits to come solely from the efforts of others. *Securities and Exchange Commission v. Howey*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1102–03, 90 L.Ed. 1244 (1946); *Curran v. Merrill Lynch, Pierce, Fenner and Smith*, 622 F.2d 216, 221 (6th Cir.1980), *aff'd. on other grounds*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1981). In determining whether these elements were present, the Court is mindful that its inquiry is conducted for the purpose of resolving defendants' mo-

tion to dismiss. Consequently, plaintiffs' claims under the securities laws should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim" that the leases were investment contracts and, therefore, securities. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Hart v. Pulte Homes of Michigan Corp.*, 735 F.2d 1001, 1004 (6th Cir.1984).

### First Element: Investment of Money

 There is no question that the plaintiffs made a payment of money. The critical inquiry is whether they made an investment of money. An investment of money occurs when an investor commits his money to an enterprise in such a manner to subject himself to risk of financial loss. *El Khadem v. Equity Securities Corp.*, 494 F.2d 1224, 1228 (9th Cir.), *cert. denied*, 419 U.S. 900, 95 S.Ct. 183, 42 L.Ed.2d 146 (1974); *S.E.C. v. International Mining Exchange, Inc.*, 515 F.Supp. 1062, 1068 (D.Co.1981). The record in this case clearly indicates that the plaintiffs' money was at risk since there was significant uncertainty as to whether any individual would realize earnings from marketing the master recordings. There was also risk with respect to the tax aspects of the transaction. Indeed, the defendants went to great lengths to warn the investors that the desired tax investment credits were not guaranteed but would depend upon how the Internal Revenue Service interpreted the commercial transactions involved in the Program. Therefore, the Court finds that there was an investment of money by the plaintiffs.

### Second Element: Common Enterprise

The Courts of Appeals are split with respect to the meaning of common enterprise. The Fifth and Ninth Circuits only require the showing of vertical commonality in order to establish a common enterprise within the meaning of *Howey*. See *S.E.C. v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 483 (5th Cir.1974), *S.E.C. v. Glen W. Turner Enterprises, Inc.*, 474 F.2d 476,

482 (9th Cir.1973), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). However, this Circuit and the Seventh Circuit require a showing of horizontal commonality. *Curran v. Merrill Lynch, Pierce, Fenner & Smith, supra*, at 222; *Milnarik v. M–S Commodities, Inc.*, 457 F.2d 274, 277–78 (7th Cir.), *cert. denied* 409 U.S. 887, 98 S.Ct. 113, 34 L.Ed.2d 144 (1972). Horizontal commonality, as defined by the Sixth Circuit, entails a relationship between investors which:

> ... ties the fortunes of each investor in a pool of investors to the success of the overall venture. [Citation omitted.] In fact, a finding of horizontal commonality requires a sharing or pooling of funds.

*Union Planters National Bank v. Commercial Credit Business Loans, Inc.*, 651 F.2d 1174, 1183 (6th Cir.), *cert. denied* 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981).

■ In examining the defendants' Program, the Court must disregard form for substance and examine the economic realities of the transactions comprising the Program. *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 851–52, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 261 (1974); *Techerepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). Moreover, as the Court stated earlier, in order to dismiss the securities claims asserted against the defendants, the defendants must show that "the plaintiffs have alleged no set of facts showing that the fate of each purchaser's investment was tied to that of the other investors through a common scheme." *Hart v. Pulte Homes, supra*, at 1004.

In considering the record before it, the Court believes that the defendants have partially met this burden. The Court notes that there is no horizontal commonality with respect to the earnings the investors expected to receive from the promotion and distribution of the master recordings. This aspect of the transaction can be fairly described as unitary in nature and thus fails to meet the horizontal commonality test as defined by this Circuit in *Curran v. Mer-*

*rill Lynch.* However, the tax aspects of the Program present a different matter.

■ The plaintiffs allege that the viability of the Program hinged upon the collective payments of many investors to Sagittarius and, therefore, horizontal commonality was present. More specifically, the plaintiffs argue that the cost basis for each master recording was based upon the purchase price. As noted earlier, Sagittarius only made a small cash payment for each recording and secured the balance with a full recourse promissory note. The plaintiffs maintain that in order for the master recordings to be fully valued for the investment tax credit, the full recourse promissory notes must be valued according to their face amount. However, Sagittarius' primary assets were the master recordings. Accordingly, the notes were effectively without recourse and were subject to being devalued. Such a devaluation would destroy the value of the investment tax credit and strip the Program of its primary benefit. This result was avoidable only by the participation of many investors in the Program. Such participation would increase Sagittarius' net worth because Sagittarius retained a significant proportion of each installment payment made by the investors. An increase in Sagittarius' net worth, in turn, would yield the appropriate cost basis to support a substantial investment tax credit. Thus, the plaintiffs argue, the financial fate of each investor was tied to Sagittarius' success in attracting additional investors to the Program.

The defendants characterize plaintiffs' argument as inscrutable. However, plaintiffs' argument is not so inscrutable that it prevented the defendants from making the same argument in their description of the tax aspects of the Program. See Booth, Lipton & Lipton 1981 tax opinion, pp. 25– 26, Exhibit A to Complaint. Given the above allegations by the plaintiffs as well as description of the program by defendant Booth, Lipton & Lipton, the Court believes that the plaintiffs have set forth a set of facts which, if proven, would establish that the favorable tax advantages each investor

sought were tied to the investment and participation of others in the Program. At the very least, the Court believes that the plaintiffs have alleged sufficient facts to establish the presence of a common enterprise as defined by this Circuit for the purpose of withstanding defendants' motion to dismiss.

### Third Element: Profits Derived Solely from the Efforts of Others

As described above, investors in the Program expected two benefits from their investment; a tax benefit in the form of the investment tax credit and the earnings derived from promoting and marketing the master recordings. Because any profits derived from marketing recordings would be derived primarily from the efforts of each individual investor, it is evident that these profits do not meet the third element of the *Howey* test. However, the tax benefits expected by the investors present a different question.

There is no doubt that the expected tax benefits flowed from the tax scheme developed and promoted entirely by the defendants. Thus, the question is not whether the tax benefits were derived solely from the efforts of others, as this component of the *Howey* test is clearly met. Rather, this case presents the novel question of law of whether tax benefits resulting from the pre-investment structuring of a transaction may constitute "profits" within the meaning of *Howey*.

The defendants, citing to *United Housing Foundation, Inc. v. Forman*, maintain that tax benefits are not "profits." In *Forman*, the Supreme Court stated:

We know of no basis in law for the view that the payment of interest, with its consequent deductibility for tax purposes, constitute income or profits. These tax benefits are nothing more than that which is available to any homeowner who pays interest on his mortgage.

*Id.* 421 U.S. at 855, 95 S.Ct. at 2062. The Court does not believe that the above conclusion is directly applicable to this case, however, since *Forman* involved tax benefits which were incidental to the "investors" main objective of securing housing. In contrast, the primary benefit that the investors expected to receive in this case were the tax benefits to be derived from participating in Sagittarius' Program.[3]

The Court notes that the few courts which have considered the above issue have reached somewhat contradictory conclusions. In *Sunshine Kitchens v. Altanthus Corp.*, 403 F.Supp. 719 (S.D.Fla.1975), a case involving the purchase and lease-back of computer equipment, the court rejected the plaintiff's argument that expected favorable tax consequences of its investments constituted profits. However, the court based its conclusion on the fact that the anticipated tax benefits of the investment depended upon the plaintiff's own accounting methods and not on the managerial efforts of others. The court did not specifically reach the question of whether tax benefits could constitute profits. Later, in *Stowell v. Ted S. Finkel Investment Services, Inc.*, 489 F.Supp. 1209 (D.Fla. 1980), *aff'd. on other grounds*, 641 F.2d 323 (5th Cir.1981), the same court held that tax benefits may be properly considered "profits" within the meaning of *Howey* where the profits from the investment take the form of a direct return on the investment and tax benefits from a favorable tax shelter. *Id.* at 1221. However, the court did not reach the question of whether tax benefits can be considered "profits" when they comprise the only return on the investment expected by the investor. See also *S.E.C. v. International Mining Exchange, Inc.*, 515 F.Supp. 1062, 1069 (D.Co. 1981). Finally, in the broadest view of this question, the court in *Sharp v. Coopers & Lybrand*, 457 F.Supp. 879 (E.D.Pa.1978) held that partnership interest could consti-

---

**3.** Both parties agree that most if not all of the investors lacked the sophistication to successfully promote and distribute the master recordings. Thus, it is clear to the Court that the investors were lured into the scheme by promise of a ratio of tax write-off to lease payment of approximately eight to one, and not by the potential earnings derived from marketing the recordings.

tute a security even if investors purchased such interests merely for the tax benefits. *Id.* at 889.

 In considering the issue before it, the Court is reminded that the three-part *Howey* test which "embodies the essential attributes that run through all of the [Supreme] Court's decisions defining a security", *Forman, supra,* 421 U.S. at 852, 95 S.Ct. at 2060, was meant to be a:

> ... flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of money of others on the promise of profits.

*Howey, supra,* 328 U.S. at 299, 66 S.Ct. at 1103. Why profits must be only in the form of dividends, profit sharing, or capital appreciation for an investment to be considered a security, as suggested by the defendants, appears, at least to this Court, to be beyond the flexible approach developed by the Supreme Court in *Howey.* Moreover, excluding tax benefits from the scope of the meaning of profits, particularly when tax benefits are the primary inducement for an individual to invest in a scheme, flies in the face of the economic reality. More importantly, a definition of "profits" which excludes tax benefits, at least under the circumstances of the present case, would be contrary to the remedial nature of the securities laws and their central purpose of protecting investors. *Techerepnin, supra,* 389 U.S. at 336, 88 S.Ct. at 553. Indeed, courts are admonished to broadly and liberally construe the meaning of "security" in order to advance the purposes of the securities laws. *Id.* at 336, 88 S.Ct. at 553; *Sharp, supra,* at 889. Therefore, the Court concludes that where, as in the present case, tax benefits are the primary or dominant economic inducement for investing, such tax benefits may properly be considered "profits" within the meaning of *Howey.* Because these tax benefits resulted solely from the efforts of the defendants in constructing the tax scheme and not from how each particular investor would report his or her income, as in the *Sunshine Kitchen* case, the Court

further finds that the Program meets the third element of *Howey, i.e.,* profits derived solely from the efforts of others. Consequently, whereas the defendants' Program shares all of the essential attributes of a security as defined by the Supreme Court in *Howey* and *Forman,* the defendants' motion to dismiss plaintiffs' federal securities laws claims because of a lack of a security is hereby DENIED.

Whereupon, upon consideration and being duly advised, the Court finds defendants' motion to dismiss plaintiffs' federal securities laws claims on grounds that the Program did not constitute a security is without merit and it is, therefore, DENIED.