David STONE and Colleen Stone,
Plaintiffs–Appellees,

v.

John Wilson KIRK and J.W.K. Land and
Cattle Company, Inc., Defendants–
Appellants.

No. 91–5833.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 20, 1992.

Decided Nov. 1, 1993.

Joel C. Morgan, J. Randall Reinhardt (argued and briefed), Reinhardt, Morgan & Arnold, Lexington, KY, for plaintiffs-appellees.

Lawrence R. Webster, Pikeville, KY, Felix J. Gora (argued), Ralph F. Mitchell (briefed), Rendigs, Fry, Kiely & Dennis, Cincinnati, OH, for defendants-appellants.

Before: MARTIN, MILBURN and NELSON, Circuit Judges.

DAVID A. NELSON, Circuit Judge.

This is a securities fraud case that arises out of sales of tax shelters designed to give investors the benefit of large investment tax credits. The credits were ultimately disallowed by the Internal Revenue Service, which found the tax shelters to be fraudulent and abusive.

The individual defendant, a certified public accountant who received hidden commissions on sales he made to groups of accounting clients and others, went bankrupt after the filing of the lawsuit. An adversary proceeding on the dischargeability of his asserted

debt to the plaintiffs, who were client-investors, was consolidated for trial with the securities fraud case.

The jury returned a verdict in favor of the plaintiffs, finding them entitled to compensatory and punitive damages and finding the debt nondischargeable in bankruptcy. The compensatory damages were trebled under the Racketeer Influenced and Corrupt Organizations Act ("RICO").

The defendants contend on appeal that (1) judgment should have been entered in their favor because the tax shelters did not come within the statutory definition of a "security;" (2) the question of dischargeability was for the court to decide, not the jury; (3) judgment should have been entered for the defendants on grounds of insufficiency of the evidence with respect both to the fraud claim and the RICO claim; (4) the trial court committed reversible error in letting a certified public accountant from Kentucky testify as an expert on professional standards in West Virginia; (5) the award of compensatory damages was excessive; and (6) the court erred in awarding punitive damages.

We conclude that the tax shelters were investment contracts, a type of investment expressly included within the statutory definition of securities; that there was sufficient evidence to support the jury's finding of liability under the securities laws, but not to support the award of treble damages under RICO; that no significant error was committed as to the expert witness' testimony; and that any error in submitting the issue of dischargeability to the jury was harmless, given the collateral effect of the judgment for the plaintiffs on the securities fraud issue.

We further conclude that the jury applied an erroneous measure of damages in its calculation of the amount recoverable under the securities laws, and we conclude that punitive damages should not have been awarded here. We shall therefore affirm the judgment as to liability for securities fraud and as to dischargeability in bankruptcy, reverse the award of punitive damages and treble damages, and remand the case for a redetermination of actual damages.

## I. Statement of the Facts.

Plaintiff David Stone, a mechanic with a high-school education, worked in a coal mining business conducted by Amber Coal Company. The company had offices in the eastern part of Kentucky, the state in which David Stone and his wife, plaintiff Colleen Stone, resided.[1]

Amber Coal Company's principals gave Mr. Stone an equity interest in the company in exchange for his services as a mechanic. As part of the compensation package, Mr. Stone testified, defendant John Wilson Kirk, who was Amber's accountant, prepared the Stones' individual income tax returns. Mr. Kirk, who was not licensed in Kentucky, maintained an office in Williamson, West Virginia.

In 1980 or thereabouts, Mr. Stone testified, the profitability of Amber's coal business rose to a point where Stone began earning hundreds of thousands of dollars a year. The top federal income tax bracket at that time was 50 percent, and defendant Kirk recommended that the Stones buy tax shelters from him to reduce their heavy tax burden. Each tax shelter was organized as a joint venture among several investors. The investors pooled their funds and jointly empowered Mr. Kirk to conduct the affairs of the venture as their agent.

Mr. Kirk allegedly represented that the tax shelters were good investments from a business standpoint and that there was "[n]ot a thing wrong with [them]" as far as the Internal Revenue Service was concerned. Some of the conversations about the tax shelters took place at Amber Coal Company's office in Kentucky, some took place at Kirk's office in West Virginia, and one took place at the Stones' Kentucky home.

---

1. In a deposition filed with the court prior to trial, defendant John Wilson Kirk testified that the offices of Amber Coal Company "were in Beauty, Kentucky, right next to Lovely." The record indicates that during 1981 and 1982 Mr.

Kirk lived in Turkey Creek, Kentucky, and the Stones lived in Louisa, Kentucky. The geographical facts are significant because of the nature of the dispute over the testimony of the expert witness.

The business of each joint venture entailed the leasing of a "master recording" that could be used for the production of phonograph records, tapes and cassettes. The recordings, which featured the work of such well known country music singers as Mel Tillis, Jerry Lee Lewis and Tammy Wynette, were owned by Sagittarius Recording Company, a corporation based in Columbus, Ohio.[2] It has not been shown that defendant Kirk had any interest in or connection with Sagittarius other than as a sales representative operating on a commission basis.

Sagittarius acquired the master recordings at grossly inflated prices, making small cash payments up front and issuing long term promissory notes for the balance. The IRS subsequently determined that the notes were without recourse, notwithstanding that they were described by Sagittarius as recourse notes. Appraisals obtained by Sagittarius to support the fair market value claimed for the masters turned out to be fraudulent. Defendant Kirk had nothing to do with the purchase of the masters by Sagittarius, nor was he involved in obtaining the fraudulent appraisals.

Under the leasing programs offered by Sagittarius, investment tax credits based on the bogus purchase prices were supposed to be passed through to the lessee-investors. A district judge who handled another Sagittarius case found that "investors were lured into the scheme by promise of a ratio of tax write-off to lease payment of approximately eight to one...." *Kolibash v. Sagittarius Recording Co.*, 626 F.Supp. 1173, 1178 n. 3 (S.D.Ohio 1986). Defendant Kirk, however, did not claim write-offs of that magnitude for the Stones.

Mr. Kirk first learned about the leasing programs from a Sagittarius vice-president who gave him an offering memorandum, or prospectus, and told him that the programs it described were good "exotic" tax shelters. (The prospectus emphasized that "THE LEASE PROGRAM DESCRIBED HERE-

IN INVOLVES A HIGH DEGREE OF RISK;" there is a conflict in the evidence as to whether Kirk disclosed this "high degree of risk" to the Stones.) Kirk's initial response, according to the testimony of his secretary, was to tell the Sagittarius man to get out of his office because "[t]here is no way that would work."

Discussions between Kirk and Sagittarius continued over a period of several months, notwithstanding Mr. Kirk's initial negative reaction, and in 1981 Kirk started selling leases of master recordings owned by Sagittarius. Although he testified, somewhat implausibly, that he began his sales efforts before he knew he would be getting commissions, he admitted that Sagittarius allowed him to keep at least 18 percent of what he took in.

There was evidence that Mr. Kirk invested some of his own money in the leasing programs so that "his clients and other people he tried to sell them to would feel more free buying them." Kirk committed himself to put $6,480 into the first joint venture for which Mr. Stone subscribed, for example. Mr. Kirk's former wife testified that Kirk kept in their home at Turkey Creek a white ledger book in which he maintained records of both his own investments and his receipts from other investors. She said that he told her "if the IRS ever came in, to be sure that they didn't get it."

Mr. Stone testified that Mr. Kirk represented that he "was going to get a small percentage of something for taking care of the book work"—Kirk's version was that he told his clients "everybody makes money on these deals"—but Kirk failed to disclose that Sagittarius was giving him a sizable percentage of the lease payments. Mr. and Mrs. Stone's understanding, they both testified, was that 100 percent of the lease payments were going to the company that owned the recordings.

There was abundant evidence that the "book work" mentioned in Mr. Stone's testi-

---

**2.** Sagittarius purchased the masters from The Cambridge Company, a Tennessee partnership. The purchase agreements contained representations by Cambridge that the recorded performances were "new configurations" not previous-

ly manufactured or sold. There were no representations that the artists had not recorded the same songs in the past or would not do so in the future.

mony was understood to be work performed by Mr. Kirk as agent for the joint ventures. Mr. Stone signed a total of three joint venture agreements, two in 1981 and one in 1982, each of which designated John Wilson Kirk as the venture's agent. The agreements empowered Mr. Kirk, acting on behalf of the joint venture, to sign leases with Sagittarius and to sign manufacturing/distribution contracts with companies which, it was contemplated, would make records and tapes from the masters and distribute the finished products.[3] Mr. Kirk undertook to file partnership tax returns for the joint ventures and to render periodic accountings to the venturers. The joint venture agreements set Mr. Kirk's compensation at five cents for each album or cassette sold, plus (in the case of two of the agreements) an annual "administration fee" of $50 or $100. Mr. Stone knew of these provisions in the joint venture agreements, and he testified that he did not know that Kirk was taking sales commissions in addition to the compensation authorized in the agreements.

Mr. Kirk signed a manufacturing/distribution agreement on behalf of at least one of the joint ventures in which the Stones invested, but judging by the royalties the Stones received on this particular investment—a total of $3.87—Kirk's compensation as agent for the venture would have been minimal. The Stones received no return at all on the other joint ventures.

The Stones' total investment—represented in large part by checks made out to defendant J.W.K. Land and Cattle Company, a corporation of which John Wilson Kirk was president—approximated $90,000. The jury could properly have found that Mr. Kirk kept more than 18 percent of this sum for himself and an employee. With respect to the 1981 Sagittarius programs, Mr. Kirk testified that

it was "normal" for him to receive an 18 percent commission. Mr. Kirk acknowledged that his secretary received five percent of the investments made in 1982, and that he himself received an additional 18 percent of the 1982 investments. Both Mr. Stone and Mrs. Stone testified that if they had known of these commissions, they would not have invested in the tax shelters.

The investments proved costly, of course; the Stones lost their $90,000, the anticipated tax benefits were disallowed, and the Internal Revenue Service demanded penalties and interest on the overdue taxes. The Stones ended up owing the IRS a total of about $280,000 in back taxes, interest and penalties. The penalty portion, according to Mr. Stone's testimony, totaled just under $45,000.

## II. The Proceedings in the District and Bankruptcy Courts.

In March of 1986 the Stones brought suit in a Kentucky federal district court against John Wilson Kirk, J.W.K. Land and Cattle Company, Sagittarius Recording Company, The Cambridge Company, and others. In addition to setting forth a claim for securities fraud under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b of the Securities and Exchange Commission, 17 C.F.R. § 240.10b, plus a claim for treble damages under RICO, the complaint alleged common law fraud, breach of contract, and professional negligence on the part of Mr. Kirk. All of the defendants except Mr. Kirk and J.W.K. Land and Cattle Company ultimately settled out of court or were dismissed for other reasons.

Mr. Kirk filed a Chapter 7 bankruptcy petition in July of 1987, and his corporation subsequently followed suit. In October of that year the Stones initiated an adversary

---

**3.** Acting as agent for the investors, Mr. Kirk also signed "lessee questionnaire and disclosure statements," prepared by Sagittarius, acknowledging receipt of all program documents, stating that the documents had been read and understood, and acknowledging that "a fee may be paid by Sagittarius to third parties as an introduction fee...." Mr. Stone denied having received the documents referred to, denied having seen the disclosure statements, and denied knowledge that Mr. Kirk was receiving "introduction fees."

The evidence is in conflict as to whether Mr. Stone received the 1981 Sagittarius prospectus. (That prospectus warned of a high degree of risk, as noted above, and urged prospective investors to consult their own legal, tax and financial advisors.) It is undisputed that Mr. Stone subscribed for the 1982 venture some months before Sagittarius issued its 1982 prospectus.

proceeding in which they sought to have their claims against Mr. Kirk held nondischargeable in bankruptcy pursuant to subsections (2), (4) and (6) of 11 U.S.C. § 523(a). Commenced originally in the bankruptcy court, the adversary proceeding was later transferred to the district court and consolidated there with the securities fraud case.

In November of 1988 Mr. Kirk moved for summary judgment on the dischargeability of the Stones' claims. The motion was accompanied by an affidavit in which Kirk asserted that he had not known anything was amiss with the Sagittarius programs until two years after the Stones made their investments. The district court denied the summary judgment motion, noting Mr. Kirk's failure to disclose his large commissions and other evidence suggesting that he should have known of the likelihood that the IRS would disallow the investment tax credit.

In a "statement of jury issues" filed in November of 1989, the plaintiffs took the position that the issue of dischargeability should be tried to the jury. The defendants filed a written response in which they renewed an offer to stipulate the facts and let the court determine dischargeability on the basis of the stipulation. Nothing came of this offer, and about a year later the defendants filed a motion to strike the plaintiffs' jury demand. The district court denied the motion.

The consolidated cases were tried to a jury in April of 1991. The defendants moved for judgment at the conclusion of the plaintiffs' case, and the motion was denied except insofar as the plaintiffs claimed nondischargeability under 11 U.S.C. § 523(a)(6), a subsection dealing with "willful and malicious injury...." The defendants renewed their motion at the conclusion of all the evidence, whereupon the court directed a verdict for defendant Kirk on the issue of dischargeability under § 523(a)(4). (This subsection deals with "fraud or defalcation while acting in a fiduciary capacity....") The plaintiffs' claim of nondischargeability under § 523(a)(2)—a subsection dealing with money obtained by "false pretenses, a false representation, or actual fraud"—was submitted to the jury, as were the securities fraud and RICO claims.

Although the court's charge to the jury included an instruction on punitive damages, which instruction came immediately after one on damages under the 1934 Act, the jury was given no instructions regarding the plaintiffs' common law fraud claim. Neither was the jury asked to decide the claims for breach of contract and professional negligence.

Responding to a series of written interrogatories, the jury found that the plaintiffs' claims against John Wilson Kirk were not discharged in bankruptcy under the court's instructions regarding 11 U.S.C. § 523(a)(2); that defendant Kirk "acted with fraud and deceit" in connection with the sale of master recording leases, as described in the court's instruction on securities fraud; that compensatory damages in the amount of $430,800 would adequately compensate the plaintiffs for any loss suffered; that the amount of punitive damages necessary to deter future misconduct was $500,000; and that the defendants violated 18 U.S.C. § 1962(c) by engaging in an enterprise through a pattern of racketeering activity, as described in the court's RICO instruction. The court entered judgment on the jury's verdict, trebling the compensatory damages pursuant to RICO (see 18 U.S.C. § 1964) and awarding interest on a total of $1,792,400 from August 29, 1982. The court subsequently denied a motion for judgment *n.o.v.* and/or a new trial, and the defendants filed a timely notice of appeal on June 25, 1991.

### III. The Investment Contract/Security Issue.

◾ The threshold question presented by the plaintiffs' securities fraud claim is whether what the plaintiffs invested in was actually a "security." See *Union Planters Nat. Bank v. Commercial Credit Business Loans, Inc.,* 651 F.2d 1174, 1179 (6th Cir.), *cert. denied,* 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981) ("The threshold question in any action brought pursuant to the Securities Acts is whether a security exists").

The statutory definition of a security, as set forth in 15 U.S.C. § 78c(a)(10), includes, among other things, "any ... investment contract...." The issue in the case at bar,

as defendant Kirk says in his brief, turns on "whether this particular financial arrangement ... is considered an investment contract under the federal securities laws." (The "particular financial arrangement" mentioned in the brief is the lease of master recordings. It is undisputed, however, that the Stones invested in joint ventures, the business of which was conducted through Mr. Kirk as agent. It was the joint ventures that leased the master recordings, not the Stones individually.)

Mr. Kirk argues in his brief that there was no investment contract. In the affidavit he filed in support of his motion for summary judgment, however, Mr. Kirk stated that "[t]he Plaintiffs were investors in a tax shelter and *investment contract....*" (Emphasis supplied.)

This characterization of the tax shelter as an investment contract is not likely to have been accidental. Well before the affidavit was prepared in 1988, the United States District Court for the Southern District of Ohio had held, in a published opinion, that the Sagittarius leasing program constituted an "investment contract" and was therefore a security within the meaning of the federal securities laws. *Kolibash v. Sagittarius Recording Co.*, 626 F.Supp. 1173 (S.D.Ohio 1986). The lawyer who drafted Mr. Kirk's affidavit was almost certainly familiar with this 1986 decision.

Subsequent case law teaches that leases purchased directly by individual investors would not constitute investment contracts if the investors' only hope of profit lay in the anticipated tax benefits. See *Newmyer v. Philatelic Leasing, Ltd.*, 888 F.2d 385, 394 (6th Cir.1989), *cert. denied*, 495 U.S. 930, 110 S.Ct. 2169, 109 L.Ed.2d 499 (1990). For reasons to which we turn next, however, we conclude as a matter of law that the plaintiffs in the case at bar were investing in investment contracts.

■ The test for determining whether a particular financial arrangement constitutes an investment contract is whether it entails

"an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *United States Housing, Inc. v. Forman*, 421 U.S. 837, 852 [95 S.Ct. 2051, 2060, 44 L.Ed.2d 621] (1975), restating the formulation set forth in *Securities & Exchange Commission v. W.J. Howey Co.*, 328 U.S. 293, 301 [66 S.Ct. 1100, 1104, 90 L.Ed. 1244] (1946).

See also *Newmyer*, 888 F.2d at 392; *Deckebach v. La Vida Charters, Inc.*, 867 F.2d 278, 281 (6th Cir.1989); *Securities & Exchange Commission v. Professional Associates*, 731 F.2d 349, 352–53 (6th Cir.1984); *Securities & Exchange Commission v. Aqua–Sonic Products Corp.*, 687 F.2d 577, 582 (2d Cir.), *cert. denied*, 459 U.S. 1086, 103 S.Ct. 568, 74 L.Ed.2d 931 (1982); *Williamson v. Tucker*, 645 F.2d 404, 418–19 (5th Cir.), *cert. denied*, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981); *Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.2d 216, 221 (6th Cir.1980), *aff'd*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982); *Kolibash*, 626 F.Supp. at 1176. The test is a flexible one, "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299, 66 S.Ct. at 1103.

Defendant Kirk does not·dispute the fact that the first element of the test—"an investment"—was present here. Kirk or his corporation admittedly received and cashed checks from Mr. and Mrs. Stone totaling about $90,000.

■ As to the second element, "a common venture," Kirk argues that under *Deckebach* and *Curran* the plaintiffs must demonstrate a "horizontal commonality" not present here. But the horizontal commonality requirement (which has never been adopted by the Supreme Court, incidentally) means only that funds of two or more investors must go into "a common pool from which all may benefit." See *Newmyer*, 888 F.2d at 394, and the cases there cited. Each of the joint ventures into which Mr. Stone put his money had three or more investors (as many as seven in one case and five in another), and funds from the common pool were to be used in each instance to exploit a master recording for the benefit of all members of the venture. If

these joint ventures had nothing else, they had horizontal commonality.

Finally, Mr. Kirk argues that the third element of the test—"a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others"— was not met because it was the individual joint venturers who were responsible for the production and sale of tapes and records made from the master recordings.[4]  It is true that the investors were general partners, in effect, but the notion that anyone envisioned the investors themselves carrying on manufacturing and marketing efforts is simply not correct.  The Stones knew nothing about the music business, and there is no reason to suppose that they had any intention of becoming active in that business.  To quote the standard-form language of the joint venture agreements, they were looking to *Mr. Kirk*, as the agent for the joint venture, to "enter into agreements . . . and do all other acts necessary to carry out the affairs of the Joint Venture."

■  It is well established that a joint venture interest can qualify as a security where the investor is "entirely passive and [where he] invested in the joint ventures in reasonable reliance on the expected efforts and expertise of the [managers]."  *Professional Associates*, 731 F.2d at 357.  *Cf. Williamson v. Tucker*, 645 F.2d at 424 (a joint venture interest can qualify as a security where "the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers").

All of the elements of an investment contract thus seem to be present here.  We are not persuaded that the investment vehicles purchased by the plaintiffs are anything other than the investment contract/securities they appear to be, and so we turn to the question whether the record contains sufficient evidence to support the jury's determination that Mr. Kirk committed "fraud" in selling such vehicles.

## IV.  The Securities Fraud Issue.

■  Where an instrumentality of interstate commerce is used in connection with the sale of a security, § 10(b) of the Securities Exchange Act of 1934 provides, it is unlawful to use "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe . . . for the protection of investors."  15 U.S.C. § 78j(b).  The jury was apprised of this statute, and was further instructed that the Commission's Rule 10b–5, 17 C.F.R. § 240.10b–5, makes it unlawful

"(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person . . . ."

In addition to proving one or more of the foregoing elements by a preponderance of the evidence, the jury was told, "the plaintiffs must establish that [they] justifiably relied on the defendant's statement or omission or conduct[,] . . . that the defendant acted with intent to defraud [or] with reckless disregard for the truth[,] . . . [and] that the defendant's conduct was the proximate cause of the injury to the plaintiffs."  Proof of recklessness is sufficient to establish the *scienter* requirement in § 10(b)/Rule 10b–5 cases, see *Securities & Exchange Commission v. Blavin*, 760 F.2d 706, 711 (6th Cir.1985), and the defendants have not taken exception to any of the foregoing jury instructions.

The defendants argue vigorously, however, that no reasonable juror could have found either that Mr. Kirk violated any duty of disclosure or that the plaintiffs justifiably

---

**4.**  Perhaps because he himself actively promoted the deals as good investments, Mr. Kirk does not argue that the investors lacked a reasonable expectation of profits.  Mr. Stone testified that he expected the ventures to make money by selling records, and the prominence of the artists who cut the master recordings suggests that this expectation was not unreasonable from Stone's perspective.

relied on any omission or untrue statement properly attributable to Kirk. Before agreeing to sell leases for Sagittarius, as Mr. Kirk's trial testimony shows, he investigated the merits of the leasing programs by speaking directly with lawyers and accountants who had helped develop them. On the basis of what these professionals told him and on the basis of what he read in the prospectus, Mr. Kirk argues, he had no reason to know that the master recordings were grossly overvalued or that there was not a reasonably good chance that the leasing programs would pass muster with the IRS. His representations to the Stones that the programs represented a "good deal," he contends, amounted to nothing more than "the common puff of the salesman."

This argument has considerable force, notwithstanding that Mr. Kirk ought to have seen a red flag in the willingness of Sagittarius to pay unusually generous commissions. (And Kirk did see a red flag, of course, when Sagittarius first explained the alleged tax benefits to him.) But Mr. Kirk was more than a plain salesman. He was the Stones' own accountant, and he was also the agent who undertook to manage the affairs of the joint ventures in which his clients and customers were investing. As agent for the joint ventures, it was up to Kirk to arrange contracts for the distribution of records produced from the master recordings—and we have found no evidence that Kirk ever seriously investigated the prospects for successful distribution of the records.

It was as the agent of the investors, moreover, and not as a salesman for Sagittarius, that Mr. Kirk signed the "Lessee Questionnaire and Disclosure Statement" forms. If Mr. and Mrs. Stone had read this form and the prospectus to which it referred, they would have learned among other things that Sagittarius was making no representations as to the marketability or profitability of records produced from the master recordings, no representations as to the tax conse-

quences of leasing the master recording, and no representations as to the accuracy of any appraisal of the master recordings' fair market value. They would have learned further that Sagittarius might be paying an "introduction fee" to unnamed "third parties." The Stones knew none of this, according to their testimony, because Mr. Kirk never showed them the form, never told them about the risks alluded to in the form and in the prospectus, and never told them about the sales commissions.

There was ample evidence from which the jury could have found that Mr. Kirk wrongfully withheld the fact that Sagittarius was allowing him large commissions. The jury was not required to believe Mr. Kirk's testimony that he did not know he would receive a commission when he sold the first investment to the Stones. And although Mr. and Mrs. Stone were hardly sophisticated about business matters, they would not have needed a degree from Wharton to realize that it might not be too good an idea to buy securities from a salesman whose commissions amount to 18 cents or more out of every sales dollar.

The existence of the commissions was a highly material fact. Knowledge of the commissions might well have deterred the plaintiffs from making the investments, just as they testified it would have—and in the context of the evidence that the Stones were not properly apprised of the risks inherent in these investments, we think the jury was entitled to find that Mr. Kirk committed fraud in omitting any mention of the commissions.

## V. The Expert Witness Issue.

■ The evidence with respect to fraud included testimony presented by Mr. Carrell Eakle, a Kentucky CPA who was called by the plaintiffs as an expert witness.[5] Mr. Eakle, whose name was on the witness list and who had given his deposition prior to

---

5. Mr. Eakle's testimony, as we read it, was instructive on the fraud issue—particularly the element of *scienter*—but was not limited to that issue. The plaintiffs' complaint alleged professional negligence as well, and Mr. Eakle seemed to be addressing that issue too. In the end,

however, the malpractice claim was not submitted to the jury, and the plaintiffs' appellate brief tells us, somewhat surprisingly, that "Mr. Eakle's testimony was not directed to an accounting malpractice issue...."

trial, took the stand without objection. By the time counsel for the defendants interposed his first objection, Mr. Eakle had already told the jury, among other things, that he had reviewed certain IRS audit findings and various Sagittarius offering memoranda; that under the law as it existed in 1981 and 1982, the Sagittarius tax shelters were "abusive;" that it was obvious from the documents provided by Sagittarius that the master recordings would not qualify for certain levels of investment tax credit because they were not "new property;" that the offering memorandum made it plain that Sagittarius could not recover the purported cost of the master recording unless something like 40 million records were sold; that the only recourse provided in the note given by Sagittarius in payment for the master was recourse against the master itself; that it was obvious from one of the offering memoranda that the president of Sagittarius, a Mr. Van-Arsdale, was under indictment for offering phony tax shelters; that a New York accounting firm retained by Sagittarius actually owned part of the company; that the auditors named in the front of the offering memorandum had merely put together a compilation statement rather than conducting an actual audit; that the State of Kentucky had regulations prohibiting CPAs from taking commissions on the sale of tax shelters; that under ethical standards put out by the American Institute of CPAs, accountants stand in a position of trust with their clients; that the American Institute is a national organization with a code of professional conduct that is closely paralleled in the laws of all 50 states; and that "this includes not only Kentucky but also West Virginia and all contiguous states to Kentucky."

All this and more came in without objection. But when counsel for the plaintiffs asked "[w]hat is the accountant's duty to his client," the defendants' lawyer, for the first time, objected.

In a bench conference on the objection, defense counsel argued that the witness appeared to be talking about Kentucky rules and Kentucky practices. "These transactions occurred in West Virginia," the lawyer continued, "and Mr. Kirk is certified in West Virginia. And there is no basis for this testimony." Defense counsel never argued that accounting malpractice was not an issue in the case, and as far as we know it still was an issue at this juncture.

The trial judge pointed out that there had been testimony about contiguous states, and he also observed that Mr. Kirk had discussed tax shelters with the Stones at their home in Kentucky. Overruling the objection, the judge told the plaintiffs' lawyer to repeat his question. The trial transcript continues as follows:

"Q. Is it my understanding that you testified that the ethical standards are the same in Kentucky and contiguous states?

A. That's correct. They follow the pronouncement as set forth by the American Institute of CPA's.

Q. And West Virginia is contiguous to Kentucky?

A. That's correct.

Q. What is the duty of an accountant to his client according to those standards?

MR. WEBSTER: Same objection.

THE COURT: Same ruling."

The witness then read to the jury, over objection, from the American Institute's Code of Professional Conduct. Among the provisions read was one prohibiting the acceptance of commissions by a CPA for referring the products or services of others to a client. The acceptance of such commissions, according to this code provision, is "considered to create a conflict of interest that results in a loss of objectivity and independence."

The witness went on to testify, without objection, that an accountant claiming investment tax credits on a client's return should tell the client what will happen to him if an investment such as this is disallowed; that accountants were being flooded with information, beginning in about 1976, concerning IRS challenges to tax shelters; and that John Wilson Kirk, in the opinion of the witness, intentionally violated his duty of objectivity.

At this point counsel for the defendants objected again (perhaps with some justification this time) and moved for an admonition

to the jury and a mistrial. "Overruled," said the trial judge. The transcript continues as follows:

"Q. In your opinion, did he violate his duty of due care?

A. Yes.

Q. In your opinion, did he violate his duty of integrity?

A. Yes.

Q. There has been testimony that with respect to one of the 1982 programs. That program was sold to Mr. and Mrs. Stone even before Mr. Kirk got the offering memorandum.

Did that violate those duties?

A. Yes."

The witness testified, finally, that the pronouncements of the American Institute of CPAs had been incorporated in the Kentucky Revised Statutes; that he did not know offhand if they had been incorporated in the West Virginia statutes; and that because of the presence of the commissions allowed by Sagittarius, Mr. Kirk's participation in the investment program constituted a violation of the duty of independence. This concluded the direct examination.

Mr. Kirk's trial counsel conducted an extensive cross-examination, in the course of which he spent considerable time on various rules that prohibit the acceptance of commissions by CPAs. Redirect and recross followed. The last significant question asked by counsel for Mr. Kirk on recross was a question calling for an opinion on what it was that Mr. Kirk had done wrong. The answer was as follows:

"In my opinion, Mr. Kirk ignored his charge as a CPA, a person who is supposed to be objective and independent when he deals with his clients. He turned his head for [a] 23 percent commission."

Mr. Kirk, represented on appeal by new counsel, now contends that because the issue of accounting malpractice was not submitted to the jury, the trial judge should have stricken Mr. Eakle's entire testimony on this subject. But the judge was never asked to do so. The issue of accounting malpractice was presumably still part of the case at the time Mr. Eakle testified, moreover, and in any event, as we have seen, defense counsel did not base any of his objections on the ground that malpractice was not an issue. Under these circumstances, we can hardly fault the trial judge for not taking it upon himself to strike Mr. Eakle's testimony.

Kirk's trial counsel did, to be sure, object to Mr. Eakle's testifying about Kentucky's CPA rules. In this connection counsel attempted to convince the trial court that the transactions with the Stones all occurred in West Virginia. The trial court was not convinced, and neither are we.

For more than four years before the trial began, there had been on file in the district court the transcript of a deposition in which John Wilson Kirk testified that the offices of Amber Coal Company, Mr. Stone's employer, were located in Beauty, Kentucky. Kirk's appellate brief represents that Amber Coal was located in West Virginia. We have found no support for this in the record, and the brief cites none. To the extent that Mr. Kirk's promotional efforts were conducted in the offices of Amber Coal Company, it looks to us as if they were conducted in Kentucky. And whatever tax shelter business was done at the Stones' home, of course, was done in Kentucky.

It is a matter of record, moreover, that the first of the joint venture agreements in question was made not in West Virginia, but in Beauty, Kentucky. That agreement—signed by both Mr. Kirk and Mr. Stone—purports to be an "[a]greement made in Beauty, Kentucky, this 16th day of October, 1981 . . . ."

The second joint venture agreement, which bears the signatures of "David H. Stone, Louisa, KY" and investors from West Virginia and Ohio as well, recites that it was "made in various places." Only the last of the three agreements recites that it was made in West Virginia.

Even if Mr. Kirk had never gone outside the State of West Virginia, finally, there would have been no basis for us to hold that the trial court committed reversible error in overruling the objections interposed during the Eakle testimony. Mr. Eakle testified, as we have seen, that similar rules govern the practice of accounting in West Virginia and

Kentucky, both sets of rules being closely parallel to the Code of Professional Conduct promulgated by the American Institute of CPAs. That testimony stands unrefuted in the record. Mr. Kirk did not take the stand until the day after Mr. Eakle testified, and Kirk had ample opportunity to contradict Eakle's testimony. As a licensee of West Virginia, Mr. Kirk would presumably have been competent to testify as to the content of West Virginia's rules—and he failed to do so. The assignment of error relating to Mr. Eakle's testimony has no merit.

## VI. The Jury–Determination–of–Dischargeability Issue.

■ The defendants maintain that the district court erred in denying the motion to strike the jury demand in the adversary proceeding on dischargeability. The question whether a debt is dischargeable in bankruptcy is an equitable question not triable to a jury, the defendants say, citing *GranFinanciera, S.A. v. Nordberg*, 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989); *In re Merrill*, 594 F.2d 1064 (5th Cir.1979); *In re Swope*, 466 F.2d 936 (7th Cir.1972), *cert. denied*, 409 U.S. 1114, 93 S.Ct. 929, 34 L.Ed.2d 697 (1973); and *Schieber v. Hooper*, 112 B.R. 1009 (9th Cir.1990). See also *In re Hallahan*, 936 F.2d 1496 (7th Cir.1991).

Relying on *Hallahan*, this court has recently held that the Seventh Amendment confers no right to a jury trial on a debtor who files voluntarily for bankruptcy, as Mr. Kirk did, and then finds himself a defendant in an adversary proceeding. *In re McLaren*, 3 F.3d 958 (6th Cir.1993). If the defendants were not entitled to a jury trial as of right, neither, we take it, were the plaintiffs.

But although the plaintiffs may not have been entitled to go to the jury on their nondischargeability claim, they were clearly entitled to go to the jury on their securities fraud claim. The jury's finding on the latter claim, we believe, controls the court's disposition of the former claim.

Under the Federal Rules of Civil Procedure, as the Supreme Court noted in *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), the same court may try both legal and equitable causes in the same action. It may make sense, in such a situation, for the court to let the jury render a verdict in the case at law before the question of equitable relief is decided. *Id.*

■ As far as dischargeability is concerned, we pointed out in *Spilman v. Harley*, 656 F.2d 224, 227 (6th Cir.1981), "[t]he determination whether or not a certain debt is dischargeable is a legal conclusion based upon the facts in the case." That "Congress intended the bankruptcy court to determine the final result—dischargeability or not— does not require the bankruptcy court to redetermine all the underlying facts." *Id. Spilman v. Harley* was a dischargeability case in which the underlying facts had allegedly been determined in a prior state court judgment, and we held that "where all of the requirements of collateral estoppel are met, collateral estoppel should preclude relitigation of factual issues." *Id.* at 228. See, to the same effect, *In re Howard P. Batie*, 995 F.2d 85, 89 (6th Cir.1993).

In the case at bar, of course, the underlying facts have been determined not in a remote state court proceeding, but by a jury sitting in the very courtroom of the district judge responsible for determining dischargeability. In deciding that issue, under the logic of *Spilman v. Harley*, the judge was bound to accept the jury's resolution of all relevant factual issues.

The jury found here as a fact that the defendants "acted with fraud and deceit" in connection with the tax shelter sales. As a matter of law, a debt for money obtained by fraud is not dischargeable in bankruptcy. 11 U.S.C. § 523(a)(2)(A). We therefore conclude that the defendants' debt to the Stones was not dischargeable as a matter of law.

Citing *Morelock v. NCR Corp.*, 546 F.2d 682 (6th Cir.1976), vacated on other grounds, 435 U.S. 911, 98 S.Ct. 1463, 55 L.Ed.2d 503 (1978), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979), and pointing out that the jury was not functioning as an advisory jury (see Rule 39(c), Fed.R.Civ.P.) when it rendered its verdict on dischargeability, the defendants argue that we should vacate the judgment on dischargeability and order the district court to render its own findings

of fact and conclusions of law. The case tried to the jury in *Morelock*, however, was a case that ought to have been tried to the court "in its entirety." *Id.* at 685. It was therefore appropriate for us to require, in *Morelock*, that factual findings be made by the trial judge. In the case at bar, by contrast, the question of fraud was properly submitted to the jury as part of the securities case. It would be inappropriate for us to require the trial judge to render separate findings of fact here, because a finding contrary to that already made by the jury on the securities fraud issue could not stand. That being so, any error committed by the district court in submitting the issue of dischargeability to the jury was harmless.

## VII. The RICO Issue.

■ The matter we discuss next—liability for treble damages under RICO—was a troublesome one for us initially. The Supreme Court's recent decision in *Reves v. Ernst & Young*, —— U.S. ——, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), appears to have resolved our difficulty.[6]

Like the case at bar, *Reves* arose under 18 U.S.C. § 1962(c), a subsection of RICO that reads as follows:

"It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...."[7]

Citing the Eighth Circuit's opinion in *United States v. Bledsoe*, 674 F.2d 647 (8th Cir.), *cert. denied*, 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982), Mr. Kirk's opening brief argues, among other things, that Kirk could not have participated in the conduct of the

affairs of a RICO "enterprise" through a pattern of racketeering activity in violation of § 1962(c) unless he and the enterprise "operated as a unit." A more precise formulation of this thought, perhaps, is the one set forth by the Eighth Circuit, sitting en banc, in the post-*Bledsoe* case of *Bennett v. Berg*, 710 F.2d 1361 (8th Cir.) (en banc), *cert. denied*, 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983):

"A defendant's participation must be in the conduct of the affairs of a RICO enterprise, which ordinarily will require some participation in the operation or management of the enterprise itself." *Id.* at 1364.

The Eighth Circuit applied this principle in *Arthur Young & Co. v. Reves*, 937 F.2d 1310 (8th Cir.1991), *cert. granted*, —— U.S. ——, 112 S.Ct. 1159, 117 L.Ed.2d 407 (1992), holding that although the Arthur Young accounting firm had committed a number of reprehensible acts—including securities fraud—in the course of its audit activities for an agriculture cooperative that fit the definition of a RICO "enterprise," these acts did not rise to the level of "participation in the management or operation of the Co-op." *Id.* at 1324. The Eighth Circuit therefore affirmed a grant of summary judgment in favor of Arthur Young on the RICO claim. The Supreme Court, in the recent decision cited at the outset of this part, affirmed the judgment of the Eighth Circuit.

The Supreme Court held that the word "participate," as used in the statutory proscription against participating in the conduct of a RICO enterprise's affairs through a pattern of racketeering activity, has a narrower meaning than "aid and abet." *Reves*, —— U.S. at ——, 113 S.Ct. at 1170. To participate in the affairs of a RICO enterprise, the Supreme Court said, "one must have some part in directing those affairs."

---

6. The *Reves* decision, which was not handed down until after we heard oral argument in the case at bar, has been cited to us by Mr. Kirk in accordance with Rule 28(j), Fed.R.App.P.

7. A "pattern of racketeering activity," 18 U.S.C. § 1961(5) provides, "requires at least two acts of racketeering activity ... the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." The term "racketeering activity" is defined as including,

among other things, "any offense involving fraud connected with a case under title 11, fraud in the sale of securities...." See § 1961(1)(D). The term "enterprise" is defined, for purposes of RICO, as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." See 18 U.S.C. § 1961(4).

*Id.* And although "RICO liability is not limited to those with primary responsibility for the enterprise's affairs," *id.,* one cannot be liable under § 1962(c) unless one has participated, in some degree, "in the operation or management of the enterprise itself." *Id.* at ——, 113 S.Ct. at 1172.

The "operation or management" test thus adopted by the Supreme Court in *Reves* is dispositive, we believe, of the RICO claim in the case at bar. It was Sagittarius Recording Company, or Sagittarius and those associated with it, that constituted the "enterprise" in this case. (See *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981), which confirms that 18 U.S.C. § 1961(4) means what it seems to say: an "enterprise" is an *entity* of some sort, such as a corporation or a group of persons associated together for a common purpose.) Mr. Kirk was associated with the Sagittarius entity as a sales representative, just as Arthur Young was associated with the *Reves* co-op as an auditor. Mr. Kirk engaged in a pattern of racketeering activity when he repeatedly violated the anti-fraud provisions of the securities laws, just as Arthur Young did. But Mr. Kirk, like Arthur Young, did not participate in the "operation or management" of the RICO entity with which he was associated—and because he was not a participant in the operation or management of the Sagittarius entity, and had no part in directing its affairs, Mr. Kirk cannot be held liable under § 1962(c).

## VIII. The Compensatory Damages Issue.

Under § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*, a person who commits certain types of security violations may be sued for rescission. If the buyer no longer owns the security, the statute authorizes suit for what the Supreme Court has termed "rescissory damages." See *Randall v. Loftsgaarden,* 478 U.S. 647, 649, 106 S.Ct. 3143, 3146, 92 L.Ed.2d 525 (1986). A plaintiff entitled to rescissory damages, the Court explained in *Randall,* "is entitled to a return of the consideration paid [with interest thereon], reduced by the amount realized when he sold the security and by any income received

on the security." *Id.* at 656, 106 S.Ct. at 3149 (internal quotes omitted).

The correct measure of damages in cases arising under § 10(b)/Rule 10b–5 is generally held to be an "out of pocket" measure. By this is meant "the difference between the fair value of all that the [plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct." *Randall,* 478 U.S. at 661–62, 106 S.Ct. at 3152, quoting *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1972). But in some circumstances, at least, it appears that the plaintiff in a § 10(b)/Rule 10b–5 case may elect to obtain rescissory damages in lieu of out-of-pocket damages. See *Randall,* 478 U.S. at 662–63, 106 S.Ct. at 3152–53.

In the case at bar the Stones no longer own the securities, in any meaningful sense, the leases having expired some years prior to trial. Rescissory damages would be available in this situation, and would be no less favorable to the plaintiffs than the out-of-pocket damages described in *Affiliated Ute Citizens.*

The total consideration that the Stones paid for the securities they purchased in 1981 and 1982 was approximately $90,000, while the return realized on the investment was negligible. Mr. Stone's testimony indicates that the IRS imposed penalties totaling $44,-628.52. In 1991 the jury awarded compensatory damages of $430,800, and the defendants argue that this exceeds the amount that would have been recoverable under a proper application of the federal securities laws. We agree.

Rescissory damages, under 15 U.S.C. § 77*l*, consist of "the consideration paid for [the] security with interest thereon, less the amount of any income received thereon...." A net investment of $90,000, with interest thereon for nine or ten years, is obviously less than $430,800, even if augmented by $45,000 in tax penalties. (The defendants have conceded that any tax penalties assessed by the IRS would be part of the recoverable damages.)

Out-of-pocket damages, the alternative to rescissory damages, are not expectancy damages. "[T]he difference between the value of what [the defrauded investor] got and what it was represented he would be getting" is not the measure; out-of-pocket damages are limited to "the excess of what he paid over the value of what he got...." *Levine v. Seilon, Inc.,* 439 F.2d 328, 334 (2d Cir.1971). The award to the Stones was no less excessive under this standard.

■ The Stones are not entitled to recover as damages the taxes they had to pay on their 1981 and 1982 income. They did not expect to have to pay such taxes, to be sure, but expectancy damages—damages designed to give the plaintiff the benefit of his bargain—are simply not recoverable under the federal securities laws.

Neither are the Stones entitled to recover the interest they had to pay on their back taxes, at least insofar as the IRS charged a market rate of interest. The Stones had the use of the tax money, of course, until the money was belatedly turned over to the IRS.

Although the Stones are entitled to recover interest on the money they paid the defendants, finally, they are not entitled to recover such interest twice. If the jury's verdict included an interest component, as the size of the award suggests it must have, the trial court obviously erred in awarding pre-judgment interest to boot.

## IX. The Punitive Damages Issue.

The remaining issue is whether the Stones were entitled to punitive damages. It is clear, we believe, that they were not.

■ Section 28(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78bb(a), expressly provides that no person permitted to maintain a suit for damages under the 1934 Act may recover "a total amount in excess of his *actual* damages...." (Emphasis supplied.) Thus "punitive damages are not authorized in private actions under § 10(b) and Rule 10b–5." *Green v. Wolf Corp.,* 406 F.2d 291, 303 (2d Cir.1968), *cert.*

*denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969).

Perhaps punitive damages would have been recoverable in connection with the Stones' common law fraud claim, but that claim was not submitted to the jury. The defendants, in a filing they made with the trial court in November of 1989, pointed out that the plaintiffs had the burden of proving fraud by "clear and convincing evidence." See *Miller's Bottled Gas, Inc. v. Borg–Warner Corp.,* 955 F.2d 1043, 1051 (6th Cir.1992) (under Kentucky law the burden is on the party asserting fraud to establish it by clear and convincing evidence); *Bowling v. Ansted Chrysler–Plymouth–Dodge, Inc.,* 188 W.Va. 468, 425 S.E.2d 144, 148 (1992) (same principle under West Virginia law). Whether for this or for some other reason, the plaintiffs acquiesced in jury instructions that dealt with the fraud issue solely in a securities law and bankruptcy context (where a preponderance-of-the-evidence standard applies), letting their common law "clear and convincing" fraud claim die on the vine. It is too late to resurrect this claim now.

## X. Conclusion.

The judgment of the district court is **AFFIRMED** insofar as it holds the defendants liable for damages under the Securities Exchange Act of 1934 and insofar as it holds the debt of defendant John Wilson Kirk nondischargeable under 11 U.S.C. § 523. The judgment is otherwise **REVERSED,** and the case is **REMANDED** to the district court for further proceedings not inconsistent with this opinion.